UNITED STATES of America, Appellee,

v.

Robert L. KING, Appellant.

No. 93–7380.

United States Court of Appeals,
Third Circuit.

Argued Dec. 10, 1993.

Decided April 14, 1994.

Harold E. Lucas, Jr. (argued), Harrisburg, PA, for appellant.

Wayne P. Samuelson, U.S. Atty., William A. Behe (argued), Asst. U.S. Atty., Harrisburg, PA, for appellee.

Before BECKER and NYGAARD, Circuit Judges, and YOHN, District Judge.*

## OPINION OF THE COURT

YOHN, District Judge.

Defendant-appellant Robert L. King pleaded guilty to one count of receiving or possessing stolen United States savings bonds, a

violation of 18 U.S.C. § 641. At sentencing, King received a two-point offense level enhancement based upon the district court's determination that he was "an organizer, leader, manager, or supervisor" in the criminal activity to which he pleaded guilty. U.S.S.G. § 3B1.1(c). His base offense level was also enhanced by four points pursuant to former sentencing guideline § 2B1.2 upon the district court's conclusion that King was "in the business of receiving and selling stolen property." U.S.S.G. § 2B1.2(b)(4)(A).[1] On appeal, King challenges the district court's application of those guideline sections, contending that both of those conclusions were erroneous. For the reasons discussed herein, we will affirm the former ruling but reverse the latter and remand for resentencing.

I.

On or about August 14, 1991, approximately 220 $1,000 denomination United States Government savings bonds were taken from a home in Middletown, Pennsylvania, during the course of a burglary. Most of these bonds ended up in King's possession by the end of the following year.[2] King's involvement with the stolen bonds was first discovered by the government on November 9, 1992, when FBI Special Agent Larry Van Loon received a tip from Don Chiarella, a confidential informant. Chiarella related that King told him that he (King) had the stolen bonds.[3] Chiarella said he informed King that he knew an individual in Philadelphia who would purchase the bonds for 20 cents on the dollar. That same day, Ben Renfro Stuart, King's co-defendant, delivered 20 $1000 denomination United States Government savings bonds to Chiarella at his

---

* The Honorable William H. Yohn, Jr., United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

1. Effective November 1, 1993, § 2B1.2 was deleted in its entirety and consolidated with § 2B1.1. See U.S.S.G.App. C, amendment 481. The enhancement for persons "in the business of receiving and selling stolen property" is now located at U.S.S.G. § 2B1.1(b)(5)(B). 18 U.S.C. §§ 3553(a)(4) and 3553(b) mandate application of the guideline in effect on the date of sentencing. Throughout this opinion, unless otherwise noted, we make reference to those sections of the

sentencing guidelines in effect at the time King was sentenced.

2. Ultimately, 205 bonds were recovered from King. The whereabouts of the approximately fifteen remaining bonds was unknown at the time of sentencing.

3. It is unknown how King gained possession of the bonds. There is no evidence that King was responsible for the initial burglary and theft of the bonds. (See Presentence Report ("PSR") ¶ 11.)

place of business and advised him that the bonds had come from King. Chiarella then turned the bonds over to Van Loon, who determined that the bonds were among those stolen in the Middletown burglary.

On November 16, 1992, Van Loon and Chiarella—with the help of Gregory Taylor, an undercover agent with the Dauphin County Drug Task Force who would play the role of Chiarella's "source" from Philadelphia—set a trap for King. Chiarella and King agreed to meet on November 18, 1992, in the parking lot of a hotel. At this meeting King was to receive $4,000 for the 20 bonds that had already been delivered and was to transfer the remaining bonds in his possession to Chiarella, who would in turn provide them to Taylor.

On the 18th, Chiarella, King, and Stuart, all driving separate vehicles, arrived at the hotel parking lot. Stuart parked his car at a distance from the others. Taylor was introduced to King as Chiarella's "source" from Philadelphia—the individual who had received the 20 bonds previously delivered by Stuart to Chiarella. Taylor paid King $4,000 cash for the 20 bonds previously delivered and negotiated with King for the purchase of the remaining bonds. After these negotiations concluded,[4] King signalled Stuart, Stuart exited his car, walked across the parking lot to King's car, handed King a package containing 109 bonds that were later determined to be among those stolen in the Middletown burglary, and began to return to his car. Stuart was arrested as he made his way to his car, and King was arrested as he attempted to leave the parking lot with 109 stolen bonds and the $4,000 that Taylor had paid him. A recording made of the conversation between King and Taylor revealed that King had informed Taylor that he had another 75 $1,000 bonds to sell.

King pleaded guilty on January 19, 1993.[5] On May 21, 1993, the day of his sentencing hearing, King surrendered 76 bonds determined to be among those taken in the Mid-

dletown burglary to the FBI. At King's sentencing hearing, the district court set his base offense level at 14. It then adjusted the base offense level upward by two levels pursuant to § 3B1.1(c) based upon the conclusion that King was an "organizer, leader, manager, or supervisor" of the scheme to sell the stolen bonds. It also adjusted the base level upward by four levels under § 2B1.2(b)(4)(A) based upon a conclusion that King was "a person in the business of receiving and selling stolen property." King now appeals, challenging both enhancements.

## II.

We have jurisdiction over King's appeal from the district court's judgment of sentence pursuant to 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291. Our standard of review of a district court's decision to adjust a defendant's base offense level under the guidelines "depends on the mixture of fact and law necessary to that court's determination." *United States v. Bierley,* 922 F.2d 1061, 1064 (3d Cir.1990) (citation omitted). "Where the decision is grounded on an essentially factual basis, we defer to the district court's findings and reverse only for clear error [but] if the alleged error is legal, the issue should be reviewed de novo." *Id.*

### A. *The § 3B1.1(c) Two–Point Enhancement*

Section 3B1.1(c) of the sentencing guidelines provides for a two-point enhancement of a defendant's base offense level if he "was an organizer, leader, manager, or supervisor in any criminal activity other than [that which involves five or more participants or was otherwise extensive]." U.S.S.G. § 3B1.1(c). King contends that the district court erred when it increased his offense level under § 3B1.1(c) because not only did Chiarella mastermind the scheme to sell the bonds but also because Chiarella, as a government agent, was not a participant in the criminal offense over whom King could have

---

4. According to the government, Taylor and King agreed upon a purchase price of 20 cents on the dollar for the remaining bonds. (Appellee's Br. at 6.) The PSR makes no mention of the specific substance of the negotiations. (PSR ¶ 7.)

5. Stuart was found guilty by a jury on January 21, 1993.

exercised any control. *See* U.S.S.G. § 3B1.1, comment. (n. 1) ("A person who is not criminally responsible for the commission of the offense (*e.g.*, an undercover law enforcement officer) is not a participant."). Whatever the merits of these contentions may be, however, their focus on Chiarella completely ignores the district court's scrutiny of the extent of King's control over Stuart, his co-defendant.

The Presentence Report ("PSR"), whose factual findings the district court adopted, (*see* Appendix ("App.") at 34B), states that shortly after his arrest, Stuart told investigators that King had recruited Stuart to assist him in selling the stolen bonds and that King had directed Stuart to deliver the first batch of 20 bonds to Chiarella. (PSR ¶ 8.) Moreover, according to Stuart, it was King who planned the mechanics of the exchange of bonds in the parking lot on November 18, 1993, instructing him to hold the bonds and to deliver them to King only after he had received a signal from King over a citizen band radio. (PSR ¶ 9.) The PSR concluded that King was an "organizer/leader" in the criminal offense and recommended that he receive a two-point offense level enhancement pursuant to U.S.S.G. § 3B1.1(c). (PSR ¶ 19.)

At King's sentencing hearing the district court did not specifically state whether it agreed with the PSR's characterization of King as the "organizer/leader" of the scheme to sell the stolen bonds or instead saw him as a manager or supervisor in the criminal activity. Rather, it concluded that King was a "major player" in the scheme to sell the bonds, noting that:

> [Although] Mr. Chiarella arranged for a means of disposing of these bonds, . . . Mr. King set up the entire operation of first testing the situation by delivering a portion of them and then setting up the rather not complex but rather detailed plan for

turning over the remaining bonds in the parking lot. . . .

(App. at N.T. 16.) Because § 3B1.1(c) provides for a two-level enhancement if the defendant acted as either an organizer or leader or alternately as a manager or supervisor, we will sustain the district court's decision to increase King's offense level under that section if there were sufficient factual grounds for the district court to have concluded that King acted in any of those roles. *See* U.S.S.G. § 3B1.1, comment. (backg'd.) (noting the inclusiveness of § 3B1.1(c)).

The direction and control of others is a recurrent theme in legal definitions of the terms "manager" and "supervisor." *See, e.g.*, Black's Law Dictionary 960, 1438 (6th ed. 1990).[6] As noted above, the district court adopted the factual findings in the PSR that King recruited Stuart to assist him in the scheme to sell the stolen bonds, instructed him to deliver the first batch of 20 bonds to Chiarella and then later, at the meeting on November 18, 1992, directed him to hold 109 bonds and deliver them to King only upon King's signal. None of those factual determinations is clearly erroneous. Indeed, King does not seriously contest their validity.[7] Thus, even if Chiarella did, as King contends, mastermind the scheme to sell the bonds, that in no way detracts from the evidence that King directed Stuart's role in the scheme.

In fact, the district court specifically found that Chiarella arranged the means of disposing the bonds but that King set up both the initial delivery of 20 bonds and the later plan for turning over 109 bonds in the parking lot. We conclude from the evidence of King's control over Stuart in those two activities that King acted at least as a manager or supervisor, if perhaps not as an organizer or leader, in the scheme to sell the stolen bonds and the district court's conclusion was not

---

6. Section 3B1.1 defines neither "manager" nor "supervisor," but does delineate a list of factors that courts should consider "[i]n distinguishing a leadership and organizational role from one of mere management or supervision." U.S.S.G. § 3B1.1, comment. (n. 4).

7. At King's sentencing hearing, the government's contention that King managed or supervised

Stuart's actions in the two exchanges of bonds went unchallenged. (*See* App. at N.T. 13–14.) Moreover, in this appeal, King never directly addresses the specific factual findings of the PSR with regard to his control over Stuart other than to assert without elaboration that "Mr. King and Mr. Stuart were equally culpable." (Appellant's Br. at 3.)

legally erroneous. Accordingly, we will affirm the district court's decision to enhance King's offense level by two points under § 3B1.1(c).

### B. The § 2B1.2(b)(4)(A) Four–Point Enhancement

■ Former section 2B1.2(b)(4)(A) of the sentencing guidelines provided for a four-point offense level enhancement when "the offense was committed by a person in the business of receiving and selling stolen property." U.S.S.G. § 2B1.2(b)(4)(A).[8] The district court determined that King had engaged in "three transactions with the group of stolen bonds" and accordingly increased King's base offense level by four points under that section. (*See* App. at N.T. 16.) King contends that the district court erred when it characterized his surrender of 76 bonds to the FBI on the day of sentencing as one of the transactions upon which it based its conclusion that King was in the business of receiving and selling stolen property. (Appellant's Br. at 5.)[9] Consequently, he argues that the four-point enhancement must be vacated because the district court could not properly have concluded that he was engaged in the business of receiving and selling stolen property. (*Id.*)

We have never before addressed § 2B1.2(b)(4)(A). The guidelines themselves are silent on the meaning of the pivotal phrase—"in the business of." A few courts outside our circuit have, however, offered some elucidation of the provision's "in the business" language. The Seventh Circuit has held that the section does not apply to thieves who sell property that they have personally stolen. *United States v. Braslaw-sky*, 913 F.2d 466, 468–69 (7th Cir.1990). In *United States v. Esquivel*, 919 F.2d 957 (5th Cir.1990), the Fifth Circuit held that "a finding that a defendant has previously engaged in fencing activities is not a prerequisite for offense level enhancement under former sentencing guideline section 2B1.2(b)(3)(A) [the predecessor to § 2B1.2(b)(4)(A) ]." *Id.* at 961. Finally, in *United States v. St. Cyr*, 977 F.2d 698 (1st Cir.1992), the First Circuit undertook a thorough analysis of § 2B1.2(b)(4)(A) and concluded that:

> [I]n mulling whether to impose the ["in the business"] enhancement, the sentencing judge must undertake a case-by-case approach, weighing the totality of the circumstances, with particular emphasis on the regularity and sophistication of a defendant's operation, in order to determine whether a defendant is "in the business" of receiving and selling stolen property.

*Id.* at 703.

In this instance, the district court's decision to enhance King's sentence under § 2B1.2(b)(4)(A) was predicated in large part upon the holding in *Esquivel, supra*, that an "in the business" enhancement under that section does not require "a finding that a defendant has previously engaged in fencing activities." (*See* App. at N.T. 16.) That principle may indeed be sound. *See St. Cyr*, 977 F.2d at 702–03 (declining, like the court in *Esquivel*, to limit the application of § 2B1.2(b)(4)(A) to "so-called professional fences"). The facts presented in *Esquivel*, however, differ markedly from those present in King's case. Therefore, although the underlying factual findings upon which the district court based its conclusion that King was in the business of receiving and selling stolen

---

8. Section 2B1.2 was deleted in its entirety by consolidation with § 2B1.1, effective November 1, 1993, which then essentially restated its key terminology.

9. The other transactions were the initial delivery of 20 bonds and the exchange of 109 bonds in the parking lot. The third transaction might perhaps be more accurately termed the possibility that King would sell another 75 bonds in the future rather than the surrender of 76 bonds to the FBI. At King's sentencing hearing, the government asserted that during the meeting in the parking lot, prior to his arrest, King had represented to Taylor that "he had an additional 75 [bonds] that he could deliver." (App. at N.T. 4.) When it was discovered that King had turned over 76 bonds to the FBI, the government urged the district court to accept that surrender of bonds as a proxy for King's alleged earlier promise to sell more bonds in the future. (App. at N.T. 5–6.) It is unclear whether it was King's actual surrender of 76 bonds to the FBI on the day of sentencing or the possibility that King might sell another 75 bonds to Taylor that the district court characterized as a transaction in reaching its conclusion that King was in the business of receiving and selling stolen property.

property were not clearly erroneous, those facts did not warrant such a conclusion.[10]

In *Esquivel,* the defendant stored 350 cases of stolen athletic shoes in a warehouse which he leased and controlled. *Esquivel,* 919 F.2d at 959. He sold the stolen shoes on consignment for $15 per pair, keeping $5 per pair for himself and paying the remainder to one of the persons who had stolen the shoes and supplied them to him. *Id.* He was assisted in the resale of the stolen shoes by a delivery man whom he would contact by pager and provide with "information regarding the customer, date, and quantity for purposes of making deliveries." *Id.* In upholding the sentencing judge's determination that the defendant's fencing activities amounted to a business, the Fifth Circuit noted that:

> Esquivel in substance acted as the manager of an organized commercial enterprise engaged in making multiple sales from a stock of stolen merchandise, employing an electronic communications system to place orders with his assistant and allocating income in accordance with a consignment plan.... [Moreover,] [t]he shoes were sold out of a central storage location and were distributed to multiple customers.

*Id.* at 960.

Here, by contrast, all of King's transactions involved a single purchaser. Moreover, his sale of the stolen bonds involved nowhere near the level of sophistication present in Esquivel's fencing operation—unlike Esquivel, he never utilized a central storage location, never employed an electronic communications system to place orders with an assistant, and never allocated income according to a consignment plan. Furthermore, King's sales of stolen property were not even remotely as repetitive as Esquivel's—at most, he successfully completed two sales and broached the possibility of one future sale.

In *St. Cyr, supra,* the First Circuit contrasted what it termed Esquivel's "elaborate fencing operation" with the activities of the defendant in that case who had twice successfully and once unsuccessfully tried to return small quantities of stolen sweaters to a retailer for cash refunds. *St. Cyr,* 977 F.2d at 700, 704. There, the court held that the government had "simply not produced a quantum of evidence sufficient to show, by any reasonable standard, that [defendant] was engaged in a business" and that "his casual trafficking in sweaters [was] insufficient ... to justify an enhancement under U.S.S.G. § 2B1.2(b)(4)(A)." *Id.* at 704 (footnote omitted). The same analysis holds true in King's case. There was simply not enough evidence to justify the district court's conclusion that King was engaged "in the business" of receiving and selling stolen property.

Indeed, as the court in *St. Cyr* noted, "regularity of conduct is one universal thread in virtually all legal definitions of business." *St. Cyr,* 977 F.2d at 703–04 (citing cases where, in various contexts, "courts have insisted that more than isolated, casual, or sporadic activity be shown before a business is found to exist") (footnote omitted). One example noted in *St. Cyr* involved U.S.S.G. § 2T1.4 which governs persons convicted of aiding, assisting, procuring, counseling, or advising tax fraud. Currently, § 2T1.4(b)(1)(B) mandates a two-point offense level enhancement for defendants "in the business of preparing or assisting in the preparation of tax returns." The commentary to § 2T1.4 states that this enhancement applies to "persons who regularly prepare or assist in the preparation of tax returns for profit." U.S.S.G. § 2T1.4, comment. (n. 2).[11]

The background note in the commentary to former § 2B1.2 explains that the enhancement for persons who receive stolen property

---

10. As previously noted, *see supra* n. 9, it is unclear whether the district court characterized King's third transaction with the stolen bonds as the actual surrender of 76 bonds to the FBI on the day of sentencing or the possibility that he might sell another 75 bonds to Taylor. In any event, our determination that the district court improperly concluded that King was "in the business" of receiving and selling stolen property would be the same under either version. The

discrepancy between the number of bonds surrendered by King to the FBI at sentencing (76) and the number he told Taylor that he could possibly sell (75) is likewise immaterial to our conclusion.

11. Other sections of the guidelines, however, utilize the term "business" without offering any illumination of its meaning. *See St. Cyr,* 977 F.2d at 704 n. 4 (citing examples).

for resale is justified because "the amount of property is likely to underrepresent the scope of their criminality and the extent to which they encourage or facilitate other crimes." U.S.S.G. § 2B1.2, comment. (backg'd.). In King's case, however, there was no evidence upon which to base a conclusion that King's irregular and occasional sales underrepresented the scope of his criminality or the extent to which he encouraged or facilitated other crimes. He made two sales from a single lot of stolen bonds and mentioned the possibility of a third sale—all to the same purchaser. His sales were not repetitive, nor was there an indication of a pattern of selling anything other than this one lot of bonds. The quantum of evidence before the district court at the sentencing hearing—two or three isolated incidents of selling stolen bonds from a single lot—did not warrant a conclusion that King was "in the business" of receiving and selling stolen property.[12]

In view of the foregoing analysis, we conclude that the enhancement under § 2B1.2(b)(4)(A) for being "in the business of receiving and selling stolen property" constituted legal error. Accordingly, King's sentence must be recalculated without it.

### III.

The two-point offense level enhancement imposed pursuant to U.S.S.G. § 3B1.1(c) will be affirmed. However, because the district court incorrectly applied the guideline enhancement for persons "in the business of receiving and selling stolen property," we will vacate the judgment and remand to the district court for further proceedings consistent with this opinion.

NYGAARD, Circuit Judge, concurring and dissenting:

I agree with most of what the majority says and I join in parts I–II(A) of the majori-

ty's well-articulated opinion. Nonetheless, because I disagree with the majority's test for determining whether a receiver of stolen goods is "in the business of receiving and selling stolen property," I respectfully dissent.

I suggest that our sentencing scheme envisions a considerably simpler test than that employed by the majority. Basically, two types of defendants are prosecuted for receiving stolen goods: those who acquire "hot" merchandise for their own use, and those who do so for resale to others. The commentary to U.S.S.G. § 2B1.2 (1992) states:

> Persons who receive stolen property *for resale* receive a sentence enhancement because the amount of property is likely to underrepresent the scope of their criminality and the extent to which they encourage or facilitate other crimes (emphasis added).

Thus, the person who acquires a stolen television set for his own use is less culpable than the person who acquires one to sell at a profit. A professional fence encourages additional thefts by others, who know their stolen booty has a ready market. This is true regardless of "the length of [the] fence's resume." *United States v. Esquivel*, 919 F.2d 957, 960 (5th Cir.1990).

To my mind, then, the test should be simple: did the defendant acquire the stolen goods with the intent to resell them? If so, the four-level enhancement applies. Intent, not an actual sale, must be the focus of the test, although in many cases, as here, a sale will provide overwhelming evidence of intent. In other contexts, intent will be readily inferable from the circumstances of the case. King was apprehended in the act of selling the stolen bonds which were obviously not

---

**12.** We also believe that the dissent's reading of § 2B1.2(b)(4)(A) overlooks the fact that § 2B1.2 sets a base level of four for any offense involving "Receiving, Transporting, Transferring, Transmitting, or Possessing Stolen Property." The title of the section, particularly the reference to "Transferring," indicates that the resale of stolen goods is already contemplated in setting the base offense level, at least with respect to certain defendants. Thus, the mere fact that a defendant

resold stolen property may already result in a base level of four. The way § 2B1.2 is structured, he must then do something else in order to receive the enhancement. In this case, the something else must be that he is in the "business" of receiving and reselling stolen property. The dissent's interpretation, by contrast, requires nothing else, essentially reading the phrase "in the business of" right out of the guidelines in many cases.

obtained for his own use; hence, I would affirm the sentence of the district court.

The district court, in applying the "in the business" enhancement, relied largely on *Esquivel*. The majority distinguishes that case on the ground that the fencing scheme was considerably more elaborate than in this case. I am not convinced. Although I believe that the monetary value of the goods fenced is irrelevant for purposes of applying the "in the business" enhancement, I note that the value of the stolen goods here was approximately $220,000 and close to the value of the 350 cases of athletic shoes at issue in *Esquivel*. Like Esquivel, King also had an "assistant" working for him in the fencing operation. Indeed, most of the distinctions relied on by the majority between the two cases spring more from the differences between the goods themselves and the different ways they had to be disposed of. Stolen savings bonds and stolen sneakers are different—the former might be saleable in two or three transactions while the latter requires a consignment scheme with central storage and electronic communications—but this does not make King any less culpable than Esquivel.

The majority instead relies heavily on *United States v. St. Cyr*, 977 F.2d 698 (1st Cir.1992). There, the First Circuit Court of Appeals held that the sentencing court must review the totality of the circumstances on a case-by-case basis. Under this scheme, the most important factor is the regularity of the defendant's fencing operation, followed by its sophistication. *Id.* at 703. Following the reasoning of *St. Cyr*, a sentencing court may apply the enhancement if the defendant has regularly been engaged as a professional fence; failing that, the enhancement may still be applied, even without evidence of past fencing activity, if the scheme is sufficiently complex. *Id.* at 704.

I think that *St. Cyr* is simply wrong. Under its needlessly complicated and unpredictable test, a first-time fence (or worse, a skilled, experienced fence who is apprehended for the first time) cannot be given the "in the business" enhancement unless the fencing operation is unusually complex. I think that is nonsense. Following this test, a person might be caught red-handed selling stolen stereo equipment from the back of a van, yet avoid an enhanced sentence. I would not adopt such a rule.

In sum, I believe whether one is "in the business" is a simple matter of intent, and because it is manifestly clear that King acquired these bonds for resale, I would affirm the district court's judgment of sentence. Hence, I respectfully dissent.