

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-6-1995

# United States v Bethancourt

Precedential or Non-Precedential:

Docket 94-5670

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"United States v Bethancourt" (1995). *1995 Decisions.* Paper 244.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/244

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS

FOR THE THIRD CIRCUIT

_____

NO.  94-5670
_____


UNITED STATES OF AMERICA

v.

RODOLFO BETHANCOURT,

                        Appellant
_____


Appeal from the United States District Court
        for the District of New Jersey
            D.C. No.  94-cr-25-1


_____



Argued June 16, 1995

Before STAPLETON, MCKEE, and ROSENN, <u>Circuit Judges</u>

Opinion Filed  September 6, 1995

_____

JEROME A. BALLAROTTO, ESQUIRE (Argued)
BRUCE L. THROCKMORTON, ESQUIRE
143 White Horse Avenue
Trenton, NJ  08610
  Attorneys for Appellant

FAITH S. HOCHBERG
United States Attorney
KEVIN MCNULTY, ESQUIRE
ALLAN TANANBAUM (Argued)
Assistant U.S. Attorney
970 Broad Street
Newark, NJ  07102
  Attorneys for Appellee

———————

OPINION OF THE COURT

———————

ROSENN, Circuit Judge.

A federal grand jury indicted Rodolfo Bethancourt
("Bethancourt") and Reginaldo Haynes ("Haynes")[1] for conspiracy
to import more than 500 grams of cocaine into the United States.
After a pretrial hearing, the United States District Court for
the District of New Jersey found that Bethancourt had knowingly
and voluntarily waived his Fifth Amendment rights and concluded
that a confession signed by Bethancourt would be admissible at
trial. The court also concluded that the discovery by the Drug
Enforcement Agency ("DEA") of $18,000 in cash at Bethancourt's
residence would be admissible at trial.

After trial, the jury found the defendant guilty. The
district court then sentenced Bethancourt to 121 months
imprisonment, five years supervised release and a $12,500 fine
pursuant to a total offense level of 32 under the United States
Sentencing Guidelines ("U.S.S.G."). Bethancourt timely appealed,
raising a number of issues relating to his trial and sentencing.[2]

---

[1]Haynes was found incompetent to stand trial and ordered to
undergo psychiatric evaluation.
[2]He claims that:

1.  The district court abused its discretion by admitting his
    confession into evidence.
2.  The district court abused its discretion by admitting into
    evidence the fact that the DEA found $18,000 at his
    residence.
3.  The prosecution engaged in misconduct during closing
    arguments by vouching for government witnesses.
4.  The district court erred in enhancing his sentence under
    U.S.S.G. section D1.1(b)(2) for use of a non-commercial air
    carrier.
5.  The district court erred in enhancing his sentence under
    U.S.S.G. section 3B1.1(c) for being a leader, organizer,
    manager, or supervisor.

We affirm.

## I.

The Government charged Bethancourt and Haynes with conspiracy to import cocaine into the United States. Because of his United States military service, Haynes had access to military aircraft and he and Bethancourt planned that Haynes would obtain a military flight to Panama. There, Haynes would pick up a kilo of cocaine from a contact arranged by Bethancourt, return to the United States, and deliver the cocaine to Bethancourt. Accordingly, Haynes flew to Panama and obtained the kilogram of cocaine. He then attempted to board a military aircraft for the return flight to the United States, but was arrested before departing.

After his arrest, Haynes cooperated with the authorities. The DEA flew Haynes back to the United States and he attempted to set up a meeting with Bethancourt. Initially, he was unsuccessful, but after several attempts and one aborted meeting, Haynes met with Bethancourt and delivered a package containing fake cocaine. The DEA arrested Bethancourt immediately thereafter. Following his arrest, the DEA advised Bethancourt of his rights and had him sign a form in which he consented to the search of his residence and automobile. When the DEA searched his residence, they found $18,000 in cash under his bed. None of this is disputed.

---

6.  The district court erred in enhancing his sentence under U.S.S.G. section 3C1.1 for obstructing justice.
7.  His conviction violates double jeopardy.

4

The DEA then interrogated Bethancourt. He initially denied any involvement in the cocaine conspiracy, but eventually admitted his involvement. After six hours of interrogation, he signed a typewritten confession detailing the conspiracy. The district court admitted Bethancourt's confession and the discovery by the DEA of the $18,000 in cash in his house as evidence at trial.

Bethancourt appeals the admission of the confession, evidence of the discovery of $18,000 in cash under his bed, and the district court's enhancement of his base offense level from 26 to 32. On appeal, he also argues that the prosecution's rebuttal summation denied him due process and that in face of the Government's seizure of the $18,000 in cash, this conviction constitutes double jeopardy.

## II.

Bethancourt initially argues that the trial court erred by determining that he gave his confession voluntarily. This court applies plenary review to a district court's determination whether a confession was given voluntarily. Miller v. Fenton, 474 U.S. 104, 115-17 (1985); United States v. Harris, 44 F.3d 1206 (3d Cir.), cert. denied, 63 USLW 3772 (1995). "In determining whether a confession was voluntary, we must satisfy ourselves that the confession was the product of an essentially free and unconstrained choice by its maker, that it was the product of a rational intellect and a free will, and that the appellant's will was not overborne." United States v. Swint, 15 F.3d 286, 289 (3d Cir. 1994) (citation omitted). The central question is whether

5

the authorities coerced the defendant's confession; if not, then the confession is voluntary. Id.

Bethancourt argues that his confession is clearly involuntary. He contends primarily that he did not actually "sign" his confession because he affixed a distorted "signature" to the confession. He maintains that the distorted and false "signature" demonstrated government coercion. He also asserts that "[l]ogically, the only conclusion for this distorted signature is that [he] did not want to voluntarily sign his name to the document." He contends that "[i]f he openly refused to sign the statement, the agents would have kept `working' on [him] in an attempt to obtain the statement that they wanted." His decision to distort his signature on the confession does not show DEA coercion; on the contrary, it suggests that Bethancourt already was planning to circumvent the consequences of his confession.

Bethancourt testified at trial that he was handcuffed during the interrogation and that the DEA agents' manner was threatening. Conversely, the DEA agents who took the confession testified that Bethancourt was not handcuffed, that they did not threaten him, and that they gave him a meal during the interrogation. The trial court concluded that the DEA agents testified truthfully and that Bethancourt did not. Therefore, the court adopted the DEA agents' version of the interrogation and confession. We must do likewise because we will not review a district court's credibility determination. Government of Virgin Islands v. Gereau, 502 F.2d 914, 921 (3d Cir. 1974), cert.

6

denied, 420 U.S. 909 (1975).  In face of the DEA agents' credited testimony, Bethancourt's distorted signature does not warrant reversal of the district court's finding that the DEA agents did not coerce the confession.

The appellant also argues that his confession was coerced because he did not sign it until nearly six hours after his interrogation began.  However, the DEA agents testified that Bethancourt confessed to his involvement in the conspiracy after about two hours of interrogation; typing and verifying the content of the confession consumed the remainder of the time before he signed it.  The agents further testified that Bethancourt reviewed the confession and that he made some changes to it before signing it.  Thus, the implication raised by the defense that Bethancourt signed a government-produced confession after six hours of badgering is disingenuous.  The testimony credited by the district court showed that the appellant actively participated in the drafting and correction of his confession. He admits that he initialed every paragraph and signed each page of the confession after it was completed; he neither requested the assistance of an attorney nor complained that he was being coerced.  Except for his testimony on his distorted signature, Bethancourt does not point to any evidence showing that the DEA agents forced him to sign an incorrect or coerced confession.  We therefore see no error in the trial court's admission of the confession.

Appellant next argues that the district court abused its discretion by allowing the Government to testify that it

found $18,000 in cash at his home.  This court reviews a district court's admission of evidence for abuse of discretion. United States v. Pelullo, 964 F.2d 193, 199 (3d Cir. 1992); United States v. Furst, 886 F.2d 558, 571 (3d Cir. 1989), cert. denied, 493 U.S. 1062 (1990).

Bethancourt contends that reference to the $18,000 found in his home was inadmissible because the Government did not connect it with the charged offense.  Therefore, he argues that the money was irrelevant in this case.  The district court found that the $18,000 in cash hidden under Bethancourt's bed was "clearly relevant concerning knowledge, intent and ability to engage in narcotics transaction."  The court also concluded that "it's axiomatic that evidence concerning the possession or expenditure of large amounts of currency is admissible where the defendant is charged with a crime in which pecuniary gains [sic] is the basic motive."

This court will only find an abuse of discretion "when the action of the trial judge is clearly contrary to reason and not justified by the evidence." Vizzini v. Ford Motor Co., 569 F.2d 754, 760 (3d Cir. 1977) (citations omitted).  Here, the trial court held a hearing regarding the admissibility of this evidence, weighed the contrary arguments and concluded that testimony concerning the discovery of $18,000 in cash under Bethancourt's bed was relevant in supporting the Government's charge.  The trial judge's ruling is not "clearly contrary to reason" and the appellant's argument has no merit.

On a more serious note, Bethancourt contends that the Government "tainted the fairness of the proceedings by vouching for government witnesses in this case" and thus that his conviction must be reversed. In considering this issue, we note that it arises because the defense counsel initially qustioned the credibility of the government witnesses in his summation to the jury. Specifically, he challenged the truthfulness of Special Agent Wagner's testimony relating to the taking of Bethancourt's toll records and all the other information secured from his residence. Defense counsel also argued that the government agents typed up the confession and "they put stuff in there that [Bethancourt] was never gonna agree to;" and that faking his signature to the confession "tells you [the jury] that in no way are they the statements, are they the words, are they the concepts, or is that the confession of Rodolfo Bethancourt. It's theirs and they tried to make it his."

Such an argument and direct challenge to the conduct of the government agents required an appropriate response. The defense on appeal strenuously argues that the response went far beyond permissible legal parameters. The prosecution responded that there was no basis to the defendant's argument, pointing out the improbability of misbehavior by the government witness. The prosecution reasoned: "For what, ladies and gentleman? He's gonna risk his career? He's gonna risk his job? He's gonna risk going to jail? For what? To lie to you on the stand, ladies and gentleman? I submit not, ladies and gentleman." The prosecution also argued that its witnesses "don't make up lies. And they

9

didn't lie here and they're not lying to you, ladies and gentlemen, when they tell you what they did. And they're not lying to you when they tell you that defendant, Rodolfo Bethancourt, talked to them about the statement." The Government acknowledges that these remarks may have been "ill-advised," but contends that they were not prejudicial.

Defense counsel made no objection. Therefore, an appellate court reviews the record for plain error. In order to be plain error, an error must not only be "obvious," it must also "have affected the outcome of the District Court proceeding." United States v. Olano, 113 S. Ct. 1770, 1778-79 (1993). United States v. Pungitore, 910 F.2d 1084, 1125-26 (3d Cir. 1990), cert. denied, 500 U.S. 915 (1991). "[W]e may only reverse if we find an error in the prosecutor's comments so serious as to `undermine the fundamental fairness of the trial and contribute to a miscarriage of justice.'" Pungitore, 910 F.2d at 1126.

We do not believe that the prosecution's rebuttal constituted plain error. Defense counsel, who represented the defendant at trial and on appeal, impressed us as articulate and experienced. Yet, at the time of the prosecution's remarks, he heard nothing in the Government's response warranting any objection whatsoever. The prosecutor's isolated and marginal comments in the course of a short rebuttal summation, which followed an untainted closing summation, did not "undermine the fundamental fairness of the trial and contribute to a miscarriage of justice." At most, they were harmless error. Moreover, the district court gave clear instructions to the jury. The court

10

specifically directed the jury's attention to the testimony of the law enforcement officers, their credibility, and the weight to be given it. The court instructed the jurors that they alone should decide whether witnesses were credible and that the testimony of a witness is not more or less believable because the witness is an official.[3]

We have carefully reviewed the summations of counsel. In light of the overwhelming evidence against the defendant and

---

[3]The judge charged as follows:

> You, the jurors, are the sole judges of the credibility of all witnesses and weight and effect of all evidence.
>
> . . .
>
> It is for you to say whether a witnesses [sic] testimony at this trial is truthful in whole or in part in light of the demeanor, explanations, and all the evidence in the case.
>
> . . .
>
> Now, you've heard the testimony of law enforcement officers. The fact that a witness may be employed by the federal government as a law enforcement officer does not mean that his testimony is necessarily deserving of more or less consideration or greater or lesser weight than that of it's ordinary witness. At the same time its quite legitimate for defense counsel to try to attack the credibility of a law enforcement witness on the grounds that his testimony may be colored by a personal or professional interest in the outcome of the case. It is your decision after reviewing all of the evidence whether to accept the testimony of a law enforcement witness and to give that testimony whatever weight, if any, you find it deserves.

the instructions of the trial judge to the jurors that they were the sole judges of the credibility of all witnesses and that the government witnesses' testimony was not entitled to any greater consideration because of their federal employment, the prosecutor's two isolated comments were harmless and did not contribute to a miscarriage of justice.

Bethancourt next disputes the two point enhancement to his base offense level under U.S.S.G. section D1.1(b)(2). This section provides that a court can enhance a defendant's sentencing level: "If the defendant unlawfully imported or exported a controlled substance under circumstances in which (A) an aircraft other than a regularly scheduled commercial air carrier was used to import or export the controlled substance."

This court reviews a district court's finding of fact supporting an upward adjustment to a sentencing level for clear error, but applies plenary review to a district court's construction of the U.S.S.G. United States v. Hillstrom, 988 F.2d 448, 450 (3d Cir. 1993); United States v. Dixon, 982 F.2d 116, 119 (3d Cir. 1992), cert. denied, 113 S.Ct. 2371 (1993); United States v. Badaracco, 954 F.2d 928, 933 (3d Cir. 1992).

The appellant contends first that the language "[i]f the defendant unlawfully imported or exported" in section D1.1(b)(2) shows that this section only applies to the person actually transporting the drugs into this country and not to a recipient of the drugs. The accuracy of this reading is irrelevant, however, because the jury convicted the defendant of conspiracy to import cocaine and he is liable for all the

12

foreseeable acts of his co-conspirator in furtherance of the conspiracy. United States v. Price, 13 F.3d 711, 732 (3d Cir.), cert. denied, 114 S. Ct. 1863 (1994); United States v. Collado, 975 F.2d 985, 997-98 (3d Cir. 1992); United States v. Carter, 576 F.2d 1061, 1064 (3d Cir. 1978).

Furthermore, Bethancourt argues that U.S.S.G. section D1.1(b)(2) does not apply to him in this case, even if the relevant conduct of a co-conspirator can trigger it, because Haynes' use of a military aircraft was not foreseeable or in furtherance of the conspiracy.

He cannot show, however, that Haynes' use of a military aircraft was unforeseeable or that it was outside the scope of his agreement with the conspiracy. Bethancourt knew that Haynes was going to Panama on a military aircraft; it was certainly foreseeable that Haynes would return on one as well. Additionally, Haynes' use of a military aircraft is clearly in furtherance of the cocaine conspiracy because it was an integral part of the plan to import cocaine into the United States. Therefore, the district court did not err when it enhanced appellant's sentence under U.S.S.G. section D1.1(b)(2).

Bethancourt next disputes the two point enhancement to his base offense level under U.S.S.G. section 3B1.1(c). This section provides that: "Based upon the defendant's role in the offense, increase the offense level as follows: . . . (c) If the defendant was a leader, organizer, manager, or supervisor in any criminal activity . . . increase by 2 levels."

13

Bethancourt correctly notes that a 3B1.1(c) enhancement is only appropriate if the defendant directed and controlled at least one individual. United States v. King, 21 F.3d 1302, 1305 (3d Cir. 1994); United States v. Katora, 981 F.2d 1398, 1402 (3d Cir. 1992). He argues that he exercised no control over Haynes, that in fact Haynes controlled him and that "there is simply no evidence to support the argument that [he] had control over anyone."

The Government responds with a long list of evidence contravening this contention. First, the telephone conversations between Haynes and Bethancourt concerned only Haynes delivering the cocaine to Bethancourt; it did not involve splitting profits derived from the cocaine sale or selling the cocaine jointly. Second, Bethancourt arranged for his contacts in Panama to supply Haynes with a kilo of cocaine. Finally, Haynes testified that Bethancourt was to pay him $500 for his services as a courier. The court found Haynes' statement to be credible.[4]

These facts provide the preponderance of the evidence necessary to justify an upward enhancement in appellant's sentencing level as a "leader, organizer, manager, or supervisor." See Badaracco, 954 F.2d at 935. We reject Bethancourt's argument that the district court improperly enhanced his sentence under U.S.S.G. section 3B1.1(c).

---

[4]Determining the credibility of witnesses is uniquely within the province of the trial court and this court will not review this determination. Gereau, 502 F.2d at 921.

14

Next, appellant attacks the two point enhancement of his sentence under U.S.S.G. section 3C1.1. This section provides that: "If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels."

Bethancourt correctly notes that the defendant must "wilfully" attempt to obstruct justice before the two point enhancement applies. United States v. Shirk, 981 F.2d 1382, 1397 (3d Cir. 1992); United States v. Belletiere, 971 F.2d 961, 965 (3d Cir. 1992). He does not, however, even attempt to show that the district court erred when it found that he intentionally gave materially false testimony. The court concluded that Bethancourt intentionally lied in an attempt to exclude a valid confession and that this was an attempt to obstruct justice. The court properly held that offering perjured testimony is an attempt to obstruct justice. See U.S.S.G. section 3C1.1 Application Note 3(b). Therefore, Bethancourt's contention that the trial court improperly enhanced his sentence for obstruction of justice has no merit.

Finally, Bethancourt argues that his criminal conviction violates double jeopardy because the Government seized the $18,000 which it found under his bed. This issue is raised for the first time on appeal and therefore has been waived. United States v. Becker, 892 F.2d 265, 267-68 (3d Cir. 1989).

In any case, the double jeopardy argument is meritless. The Government notes that the $18,000 was not seized through a

15

court proceeding, but rather administratively by the DEA. Therefore, the seizure of the $18,000 is not relevant to the criminal sentence before this court because the seizure was not the result of any judicial direction or proceeding.

### III.

In summary, we perceive no error in any of the district court's evidentiary rulings or any denial of due process by the prosecution's closing rebuttal summation. Moreover, the appellant has not drawn our attention to any judicial proceeding forfeiting the $18,000 discovered at his home. Thus, there is no basis for his double jeopardy argument. Finally, we see no error in the court's sentencing decisions.

Accordingly, the judgment of conviction and sentence of the district court will be affirmed.

**United States of America v. Rodolfo Bethancourt**

**NO. 94-5670**

**McKEE**, <u>Circuit Judge</u>, **concurring in part and dissenting in part**.

I concur with the majority opinion except insofar as the majority concludes that the prosecutor's remarks do not constitute prejudicial plain error.

As my colleagues point out, the government concedes that the challenged portion of the prosecution's rebuttal summation was "ill-advised." Indeed, it was more. It was unethical, unnecessary, and I believe it raises doubts about the very verdict it sought to compel.

Failure to object to improprieties in a closing argument precludes appellate review in all cases except where `plain error' is established. <u>United States v. Lawson</u>, 337 F.2d 800, 807 (3d Cir. 1964), <u>cert. denied</u>, 380 U.S. 919 (1965). We must "correct a plain forfeited error affecting substantial rights, if the error `seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" <u>United States v. Olano</u>, 113 S. Ct. 1770, 1779 (1993) (quoting <u>United States v. Atikinson</u>, 297 U.S. 157, 160 (1936)). <u>See</u> FED. R. CRIM. P. 52(b). The error here affects all three.

During his rebuttal address to the jury, Assistant United States Attorney John P. Suarez, the prosecutor here, responded to an attack upon a government agent's credibility by arguing as follows to the jury: "[f]or what, ladies and gentlemen? He's gonna risk his career? He's gonna risk his job?

17

He's gonna risk going to jail?  For what?  To lie to you on the stand, ladies and gentlemen?  I submit not, ladies and gentlemen."  That argument was forceful, responsive, and absolutely proper. Mr. Suarez was asking the jury to reach a common sense conclusion that the agent had too much to lose to commit perjury merely to convict this defendant. It was the kind of effective and logical response to an attack on an agent's credibility that has been made in countless numbers of closing arguments, and will be made in countless more.

However, Mr. Suarez was not content to let well enough alone. He insisted upon gilding the lily. Having made his point, he marched forward and assured the jury that government witnesses "don't make up lies.  And they didn't lie here and they're not lying to you . . . when they tell you what they did.  And they're not lying to you when they tell you that defendant, Rudolfo [sic] Bethancourt, talked to them about that statement."  That argument contains two serious improprieties. First, the prosecutor is, in no uncertain terms, telling the jury as a matter of fact that the particular witness didn't lie. Second, and I think even worse, he is telling the jury that government witnesses don't lie as a matter of policy.

In his opening statement, the defense counsel attacked the credibility of government witnesses as follows:

> You're going to hear the evidence and you're going to decide whether or not what they say happened happened . . . .
>
> But I ask you, as the evidence comes in, listen very carefully and determine whether or not you accept what's on these transcripts

as being the evidence in this case because only you can make that determination. . . .
Listen to the evidence. All right? Just listen to the evidence. Don't jump to any conclusions here . . . .

Supp. App. at 58-63. Obviously, if the defendant was going to put on a defense, the defense attorney had to attack the credibility of the agent who took the defendant's statement. In his closing, defense counsel attempted to raise a reasonable doubt about the authenticity of the defendant's statement:

Is it reasonable for you to believe that because his signature that was contained on that statement was not his real signature but it was a fake, it was a disguise, what do you think happened? <u>I'm gonna suggest to you what you know from your common sense</u> happened here. They typed this stuff up, they put stuff in there that he was never gonna agree to and they wouldn't leave him alone. He was there for six hours. It's now midnight. How did he get out of that room with these agents and get to go to jail which was probably a better place than sitting with them in that room even though he got a chicken sandwich? You know what he did, yeah, okay. And he forged his signature. He faked it. <u>What does that tell you</u>? That tells you that in no way are they the statements, are they the words, are they the concepts, or is that the confession of Rudolfo [sic] Bethancourt. It's theirs and they tried to make it his. This is not a strange concept in the world. This kind of attempts to put one thing on paper and get somebody else to agree with it by signing their name too it. This is an old story. That's how he got out of that room. And that's why Gus Lesnevich is so clear to you that if Bethancourt wrote that on there it's an intentional disguise. <u>You take it from there.</u>

Supp. App. at 497-98 (emphasis added).

19

The defense counsel sought to have the jury draw certain conclusions from the testimony, and their own common sense. That was entirely proper. Yet, even if the defense attorney's argument had been improper, it does not justify the kind of response that occurred here. The defense attack on the credibility of the government agent called for an appropriate and reasoned response. Mr. Suarez's rebuttal was neither. Over thirty years ago this court stated:

> A United States attorney in a criminal case has an even greater responsibility than counsel for an individual client. For the purpose of the individual case he represents the great authority of the United States and he must exercise that responsibility with the circumspection and dignity the occasion calls for. His case must rest on evidence, not epithet. If his case is a sound one his evidence is enough; if it is not sound, he should not resort to epithet to give it a false appearance of strength.

United States v. Kravitz, 281 F.2d 581, 587 (3d Cir. 1960), cert. denied, 364 U.S. 941 (1961) (emphasis added).

When Mr. Suarez assured the jury that government agents "don't make up lies," and that they were not lying when they testified in this case, there is no doubt that he was asserting his personal opinion to the jury and, even worse, guaranteeing that the United States does not allow its witnesses to lie. My colleagues state:

> We do not believe that the prosecution's rebuttal constituted plain error. Defense counsel, who represented the defendant at trial and on appeal, impressed us as articulate and experienced. Yet, at the time of the prosecution's remarks, he heard nothing in the Government's response warranting any objection whatsoever. The

20

> prosecutor's isolated and marginal comments in the course of a short rebuttal summation, which followed an untainted closing summation, did not 'undermine the fundamental fairness of the trial and contribute to a miscarriage of justice.' At most they were harmless error.

Majority opinion at 9-10 (footnote omitted).

Over twenty years ago we addressed the problem of prosecutorial indiscretion in closing statements. We were obliged to "consider such errors because of their recurrence in criminal trials and the consequent importance of emphasizing the impropriety of such practices by prosecuting officers. " United States v. LeFevre, 483 F.2d 477, 478 (3d Cir. 1973) (Seitz, J.). We explained that "[w]e recognize the line between permissible and impermissible comment is a thin one, and precision of expression can be difficult. Nevertheless, we strongly disapprove expressions of personal opinion by prosecutors on credibility and guilt." Id. Although we did not find the comments at issue in LeFevre to be sufficiently prejudicial to constitute reversible error, we were careful to "emphasize that the trial judge should be alert to each of these deviations from professional norms. Since such comments have the clear potential of adversely affecting the defendant's right to a fair trial, the judge should take prompt action to correct them without relying upon defense counsel to object." Id. at 480. Soon thereafter in United States v. Homer, 545 F.2d 864 (3d Cir. 1976) (per curiam), cert. denied, 431 U.S. 954 (1977), we deemed it necessary to again comment upon the "rash and inappropriate" remarks of

21

prosecutors during closing arguments. In Homer, the court issued the following scolding: "[i]n recent years we have had the occasion to admonish counsel for thoughtless and inappropriate remarks made in the course of heated and vigorously contested trials. . . . [T]he comments are so grossly improper as to prejudice a defendant and deny him a fair trial." Id. at 867.

We have repeatedly had to address this problem. See United States v. Reilly, 33 F.3d 1396, 1421-23 (3d Cir. 1994); United States v. DiLoreto, 888 F.2d 996, 999-1000 (3d Cir. 1989); Government of the Virgin Islands v. Joseph, 770 F.2d 343, 348-51 (3d Cir. 1985); United States v. DiPasquale, 740 F.2d 1282, 1296-97 (3d Cir. 1984); United States v. Scarfo, 685 F.2d 842, 848-49 (3d Cir. 1982); United States v. Gallagher, 576 F.2d 1028, 1041-43 (3d Cir. 1978); United States v. Homer, 545 F.2d 864, 867-68 (3d Cir. 1976); United States v. Somers, 496 F.2d 723, 739-41 (3d Cir. 1974); United States v. Schartner, 426 F.2d 470, 477-80 (1970). Even though we held in each of these cases except Schartner that the particular statement did not constitute reversible error, this history demonstrates that our oft repeated refrain as to the impropriety and danger of such argument is falling upon deaf ears.

Moreover, we recently addressed a rebuttal that was nearly identical to the one before us here. In United States v. DiLoreto, 888 F.2d 996 (3d Cir. 1989), the prosecutor told a jury, "[w]e don't take liars. We don't put liars on the stand. We don't do that." Id. at 999 (emphasis in original). We

analyzed the likely effect of such a statement upon the jury's deliberations as follows:

> The remarks are better understood as meaning that the government, as a matter of policy in the prosecution of its cases, does not use liars as witnesses.  No explanation was given, however, of how the government ascertains the honesty or veracity of its witnesses.  Indeed, we have found nothing in the record upon which the prosecutor could have grounded his statement. . . . What the jury was lead to do instead was merely to infer that other information existed which the government used to verify the credibility of its witnesses prior to introducing their testimonies at trial. . . .
>
> The possibility that the jury engaged in such deductive reasoning, prompted by the government's vouching of its witnesses, especially in light of the crucial nature of the witnesses' credibility here, clearly jeopardized the defendants' right to be tried solely on the basis of the evidence presented at trial.

Id. at 999-1000.  Although this court subsequently decided that the per se reversal rule of DiLoreto could not stand under United States v. Young, 470 U.S. 1, 11-12 (1985), the analysis of the impact of the closing remains valid.[5]

Furthermore, our sister courts of appeals have also met with difficulty in stopping such abuse. In United States v. Maccini, 721 F.2d 840, 846 (1st Cir. 1983), the court stated:

> That despite our consistent warnings to the Government we should still be called upon to admonish against such conduct is reprehensible per se because it constitutes a

---

[5]      See United States v. Zehrbach, 47 F.3d 1252 (3d Cir.) cert. denied, 115 S. Ct. 1699 (1995).

23

> disregard to our directives. But additionally it is particularly pernicious because it results in an unnecessary waste of judicial resources, both at the trial and appellate level, by diversion and attention to review of what by now should be understood to be totally unacceptable conduct by those who lay claim to representing the Government of the United States.

Similarly, the Court of Appeals for the Second Circuit has noted: "[a] few injudicious words uttered in the heat of battle by an Assistant United States Attorney may undo months of preparation by police, prosecutorial, and judicial officers." United States v. White, 486 F.2d 204, 204 (2d Cir. 1973). See also United States v. Modica, 663 F.2d 1173, 1182–83 (2d Cir. 1981) ("This Court, in particular, has repeatedly expressed frustration at the regular appearance on its docket of cases in which prosecutors have delivered improper summations."); United States v. Drummond, 481 F.2d 62, 64 (2d Cir. 1973) (reversing conviction following the third appeal involving improper summations by the same prosecutor).

Here, given the effect that the rebuttal may well have had upon the jury's deliberations, see DiLoreto, supra, and the serious and repeated nature of this type of transgression, I do not believe that the error was harmless, even despite the defense attorney's failure to object, and the curative instruction given by the attentive trial judge. See Fed R. Crim. P. 52(a). ("Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.")

24

As noted above, I find our analysis of the nearly identical statements in DiLoreto compelling insofar as we there discussed the probable effect of such an argument upon the jury's deliberations. When Mr. Suarez here vouched for the government agents, (indeed all government witnesses) his comments were not only prejudicial to Bethancourt, they also undermined the fairness and integrity of the judicial proceedings. I do not see how those remarks could have done anything other than corrupt the deliberations to the point that this defendant could not have received a fair trial. Moreover, since the prosecutor apparently felt that the strength of his case required poisoning the deliberative process, I can not say that the evidence against this defendant was so "overwhelming" that the remarks were irrelevant to the determination of guilt. Had the prosecutor felt that the evidence was so compelling I assume he would not have felt it necessary to resort to such an improper argument.

The reliability of the outcome of this trial, as well as the public perception of fairness dictate that we conclude that this error was not harmless and that it requires a new trial. The essence of the Government's case was the testimony of the agents who took the statement from the defendant. Under those circumstances, the prosecutor's rebuttal can not be dismissed as harmless error.

Although I continue to believe that Young clearly prohibits a per se rule of reversal in cases such as this and DiLoreto, this case would present a strong argument for just such a rule if we were free to establish one. Despite our best

25

efforts, some prosecutors continue to engage in behavior that can only corrupt the judicial process and undermine the very investigative and prosecutorial resources they seek to serve. They apparently do so with little or no concern for the effect of their actions upon the quality of justice, their positions as officers of the court, or the real possibility of causing an erroneous conviction. Yet, we continue to oblige their nonchalant approach to justice by finding their transgressions to be harmless.

Because such transgressions poison the deliberative process, I must respectfully dissent from the reasoning of my colleagues.