

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-21-1998

# United States v. Cottman

Precedential or Non-Precedential:

Docket 96-5492

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"United States v. Cottman" (1998). *1998 Decisions.* Paper 84.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/84

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed April 21, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 96-5492

UNITED STATES OF AMERICA

v.

STANLEY COTTMAN,

      Appellant.

On Appeal from the United States District Court
for the District of New Jersey
D.C. Criminal Action No. 95-cr-00661

Argued July 23, 1997

Before: SLOVITER, Chief Judge and ROTH, Circuit Judges
LUDWIG,1 District Judge

(Amended Opinion Filed 4/21/98)

        Faith S. Hochberg
        United States Attorney
        Allan Tananbaum (Argued)
        Assistant U.S. Attorney
        Kevin McNulty
        Assistant U.S. Attorney
        Office of United States Attorney
        970 Broad Street, Room 502
        Newark, NJ 07102

        Attorneys for Appellee
_____

1. Honorable Edmund V. Ludwig, United States District Court Judge for
the Eastern District of Pennsylvania, sitting by designation.

Karim Arzadi (Argued)
Law Office of Karim Arzadi
163 Market Street
Perth Amboy, NJ 08861

    Attorney for Appellant

OPINION OF THE COURT

ROTH, Circuit Judge:

Stanley Cottman pled guilty to one count of conspiracy to possess, sell, and dispose of stolen property in violation of 18 U.S.C. S 371. He was sentenced to 10 months in prison, a three year term of supervised release, and restitution in the amount of $32,420, payable to the FBI. He has appealed two aspects of the sentence imposed by the district court. First, he claims that the district court incorrectly applied a four point upward adjustment under Sentencing Guideline S 2B1.1(b)(4)(B) on the basis that he was "in the business of" receiving and selling stolen cable equipment. Second, he contends that the district court had no authority to order him to pay restitution to the FBI for funds it spent as part of an undercover sting operation to acquire the stolen cable equipment from him. We find no error in the sentence enhancement under S 2B1.1(b)(4)(B) and we will affirm that portion of the sentence. However, because we conclude that the FBI was not a victim of Cottman's offense, we will vacate that portion of the judgment of sentence, imposing restitution, and we will remand this case for resentencing.

I. Factual Background and Procedural History

Pursuant to an ongoing investigation of cable television piracy, the FBI established an undercover warehouse operation in Kenilworth, New Jersey. Agents equipped the premises with video and audio recording devices. An undercover FBI agent (the UCA) was the principal operator of the warehouse. Transcripts and videotapes of

2

conversations, as well as other evidence developed as part of the sting, revealed the following events:[2]

On February 7, 1995, the UCA in a consensually monitored telephone conversation, spoke to a person known to the UCA as Frank Russo. Russo advised the UCA that an individual known as George "the Animal" Kanter expected to obtain approximately 80 General Instrument Corporation (GI) cable boxes within a week. Russo inquired whether the UCA would act as a "middle man" and receive the boxes on his behalf. The terms of the transaction called for a total cost of $150 per unit, which broke down into $130 for the merchandise, $10 for Kanter's commission, and $10 for the UCA. Russo further explained that, as this was a "green deal," cash up front would be required. Russo asked the UCA to front the cash for him because he would be detained in Florida and unable to bring the money up personally. When the UCA agreed to broker the deal, Russo stated that he would have Kanter contact the UCA immediately.

_____

2. The Pre-Sentence Report (PSI) also discussed statements provided by an anonymous source who advised the FBI in December 1994 about many of Cottman's alleged activities. The Source made an uncorroborated statement that sometime in 1994 or 1995 Cottman had been involved in an armed robbery of a cable store in Philadelphia, Pennsylvania, with another individual known only to the Source as "Al." Al received approximately 70% of the proceeds from selling the units obtained in the heist and $5,000 for his role in the robbery, while Cottman received $14,000. See PSI at P 12.

The Source also disclosed details about Cottman's trade in cable boxes. According to the Source, Cottman had suppliers from Baltimore to New York who fed him cable boxes, chips, and cellular phones. The Source indicated that Cottman sold an average of 300 to 400 stolen General Instrument cable boxes per month. The Source also stated that Cottman had branched out into reselling stolen vehicles. PSI P 13.

Finally, the source identified a number of Cottman's alleged sources. These included individuals identified as Walay, Leo "the Chinaman" from New York, Roger, Frank, and Kevin. The Source stated that Kevin was a resident of Philadelphia and heavily involved in stolen credit cards and cable boxes. The source credited Kevin with providing Cottman with approximately 100 cable boxes per month. PSI P 14.

Within minutes the UCA heard from Kanter. Kanter stated that he had 65 units and that "his guy," was going to get more. Kanter said he would be in touch again when they were ready to do the deal.

The following day, February 8, 1995, Kanter again contacted the UCA. Kanter stated that "his guy" should be back that day, that he would have the total number of units by that night, and that a meeting would be arranged shortly.

On February 10, Kanter and "his guy" Stanley Cottman delivered about 70 boxes containing 65 GI baseband units, many of which appeared to be in brand new unopened shipping cartons. The UCA paid $8,650 in cash to Cottman and $650 to Kanter. During the meeting, Cottman removed all of the serial numbers from the cartons and instructed the UCA to remove all the stickers from the original boxes. Cottman also took the opportunity to elaborate on his involvement in the illegal cable box trade. Cottman boasted that "[A]t one point I get 3 hundred . . . . See, I deal with the same ole people over and over and over, the same ole people, no problems. . . . It's slow now since the people we deal with is so good, they get stuff even if it's slow . . . ."

Later investigation revealed that at least 52 of the 65 GI units were brand new. Approximately 9 of the units had been shipped in late December 1994 to TCI Cablevision in Baltimore, Maryland, while the remaining units had been shipped to Comcast Corporation in Philadelphia just eleven days before the sale.

Cottman, without Kanter, returned to the UCA's warehouse on February 19, 1995, to consummate another deal. Cottman explained that he had left Kanter out of this transaction because he was unsure of his ability to obtain the boxes. Cottman produced 75 GI baseband cable boxes for which the UCA paid him $10,500.

The UCA engaged Cottman in further discussion about his involvement in illegal cable box trafficking. At one point Cottman said to Kanter: "It started out with one and two to where me and him was moving thousands . . . a week. So I had met a lucky connection up here." Cottman also repeated his assertion that, although he usually got 100 or

4

200 units per week, at one time he was pulling in about 300 cable boxes a week from his sources. With further inquiries from the UCA, Cottman explained that the people he worked with at the cable companies would pilfer the cable boxes by simply erasing them from the inventory lists on the companies' computers.

Later investigation again revealed that 64 of the 70 baseband units Cottman sold to the UCA were new. All 64 had been shipped to TCI in Baltimore on February 7 and 8, 1995, and received on February 13 and 14. Of these, 62 had been in the possession of Excalibur Cable Communications, Ltd., of Baltimore and had allegedly been stolen in a strong arm robbery of one of its employees, Steven Holder, on the evening of February 17, 1995, just two days before Cottman sold them to the UCA.

Cottman later denied any involvement with the robbery or knowledge of how he came to acquire the Excalibur Cable boxes, insisting that all the cable boxes had been provided by an Englishman named "Roger." However, telephone records indicated that calls were made from Cottman's residence to Holder on February 9, 19, and 26, 1995. Furthermore, Cottman's "800" number telephone records showed that he was called by Holder's supervisor, Dwight Chew, on January 15, 1995.

Finally, on February 21, 1995, Cottman and Kanter together came to the warehouse to deliver about 86 GI baseband cable boxes in exchange for $13,280 paid to Cottman and $1650 paid to Kanter. Cottman again physically removed the serial numbers from the outside packing cartons and instructed the UCA that the serial numbers needed to be stripped from the individual boxes. Later investigation revealed that 40 of these units had been shipped to Comcast of Philadelphia and TCI of Baltimore in February 1995.

In these three transactions, Cottman sold a total of 231 cable boxes for $34,730.3
_____

3. The restitution of $32,420, which the the district court ordered Cottman to pay, has had the amount paid to Kanter, $2,310, deducted from the total payments of $34,730.

5

Cottman was indicted on one count of conspiring to possess and sell stolen cable equipment, valued in excess of $5,000, that had crossed state lines in violation of 18 U.S.C. S 371, and three substantive counts charging him with the receipt and sale of stolen cable equipment, valued in excess of $5,000, that had crossed state lines in violation of 18 U.S.C. SS 2 and 2315. Federal authorities arrested Cottman on March 7, 1995, at his residence in Perth Amboy, New Jersey.

Cottman made a voluntary statement to the FBI following his arrest in which he stated that he had been employed with RTK Cable Company and had run a sideline business called Incognito Sound Labs, Inc., which he operated out of a public storage facility. According to Cottman, the principal focus of his business was the installation of car radios, for which he would charge $500. Cottman also admitted that he had in the past worked for various cable companies in order to make contacts who would later provide him with cable boxes.

After negotiations, a written plea agreement was reached. Pursuant to the agreement, Cottman entered a guilty plea to the conspiracy count on March 7, 1996. The district court then dismissed the three substantive counts of the indictment.

On July 22, 1996, Cottman was sentenced by the district court to a 10-month prison term to be followed by 3 years of supervised release. As a special condition of supervised release, the court ordered Cottman to pay as restitution the $32,420 expended by the FBI to acquire the stolen cable boxes from him. The district court denied Cottman's request for bail pending appeal.[4]

Cottman immediately filed his notice of appeal. The notice was dated July 22, 1996, but was not filed by the clerk until July 25, 1996. One day later the district court entered its final judgment and order of commitment.[5]

_____

4. This Court denied a similar motion by Cottman on August 29, 1996.

5. While at one time this sequence of events might have been fatal to Cottman's appeal, see United States v. Matthews, 462 F.2d 182, 183-84 (3d Cir. 1972), the rule is now firmly established in this Circuit that a

II. Sentencing Issues

A. Mootness

As a preliminary matter, we must consider the fact that Cottman has completed his ten month term of incarceration, leaving only his three years of supervised release to be served.6 We must determine whether the completion of his term of imprisonment has mooted Cottman's challenge to the district court's application of the "in the business" enhancement.

Although the Seventh and Eleventh Circuits have determined that challenges of the length of defendants' sentences are no longer viable after the defendant has been released from custody, see, e.g., United States v. Ross, 77 F.3d 1525, 1549 n.6 (7th Cir. 1996); United States v. Farmer, 923 F.2d 1557, 1568 (11th Cir. 1991), we do not agree. We conclude that a finding of mootness is forestalled here because Cottman may still suffer " `collateral legal consequences' from a sentence already served." Pennsylvania v. Mimms, 434 U.S. 106, 108 n.3 (1977) (per curiam).

Two considerations, both of which are products of the Federal Sentencing Guidelines, lead us to this determination. First, the S 2B1.1(b)(4)(B) "in the business"

_____

premature notice of appeal in a criminal case can ripen into valid notice of appeal when the district court enters the judgment of sentence. See United States v. Hashagen, 816 F.2d 899, 900-06 (3d Cir. 1987) (in banc). The revised rule comes with the proviso that a premature notice is prejudicial and will not preserve the appeal if it "is filed so early that it does not properly apprise the opposing party of its intention to appeal the final judgment." Id. at 903.

We have no need to invoke the proviso here. Cottman's notice, while premature, was filed just one day before the entry of the judgment of sentence. The district court docket reveals no events intervening between Cottman's notice and the entry of final judgment. Indeed, this Court has considered this exact situation previously and found the notice of appeal adequate to confer appellate jurisdiction. See United States v. Console, 13 F.3d 641, 649 n.3 (3d Cir. 1993).

6. Cottman's attorney informed us of this fact at oral argument.

sentencing enhancement increases Cottman's Criminal History Category from I to II for any future convictions. See, e.g., United States v. Kassar, 47 F.3d 562, 565 (2d Cir. 1995); United States v. Chaves-Palacios, 30 F.3d 1290, 1292-93 (10th Cir. 1994); United States v. Dickey, 924 F.2d 836, 838 (9th Cir. 1991). The district court's application of the enhancement increased Cottman's total offense level from ten to twelve, pushing him from Zone B to Zone C on the Sentencing Table which determines his guideline range. See U.S.S.G. S 5A (1995). Because his sentence placed him in Zone C, Cottman no longer qualified for a sentence of probation in lieu of imprisonment. See U.S.S.G. SS 5B1.1 & 5C1.1 (1995). Cottman, as a result, acquired two, rather than one, criminal history points. The net outcome is that a sentence for any future conviction which may be imposed upon Cottman under the Guidelines will be significantly increased.

Second, if we were to find an error in the application of the "in the business" enhancement, the appropriate sentencing range would be reduced from 10-16 months to 6-12 months. See U.S.S.G. S 5A. This reduction would likely merit a credit against Cottman's period of supervised release for the excess period of imprisonment to which Cottman was subjected. See United States v. Fadayini, 28 F.3d 1236, 1241 (D.C. Cir. 1994).

For these reasons, we do not consider Cottman's appeal to be moot even though he has served the imprisonment portion of his sentence.

B. Application of the "In the Business" Enhancement

The first of Cottman's challenges to his sentence is to the district court's application of the four level sentencing enhancement for persons in the business of receiving and selling stolen property. See U.S.S.G. S 2B1.1(b)(4).7 This

_____

7. Section 2B1.1(4) provides:

> (A) If the offense involved more than minimal planning increase by 2 levels; or

> (B) If the offense involved receiving stolen property, and the defendant was a person in the business of receiving and selling stolen property, increase by 4 levels.

8

enhancement is seen as a more severe punishment for "people who buy and sell stolen goods, thereby encouraging others to steal, as opposed to thieves who merely sell the goods which they have stolen." United States v. Sutton, 77 F.3d 91, 93 (5th Cir. 1996).

At sentencing, the district court in its bench ruling extensively discussed United States v. King, 21 F.3d 1302 (3d Cir. 1994), the lone decision of this Circuit interpreting the "in the business" enhancement of U.S.S.G. S 2B1.1. In addition, the court thoroughly reviewed the evidence adduced by the parties. The district court found that "Cottman had a steady source of stolen cable boxes that was generated from more than one robbery or theft" and concluded that the operation in which Cottman participated was a sophisticated one given that "his source of cable boxes appear [sic] to have been persons employed by cable companies who obtained the boxes in part by deleting the boxes from the companies' inventories to conceal their theft." Based on these findings the court found that Cottman was "clearly an integral part of this operation" and deserved the sentencing enhancement even if he was not the "criminal mastermind" behind it.

In King, we briefly reviewed the approaches taken by other circuits that have considered a defendant's eligibility

_____

U.S.S.G. S 2B1.1 (Nov. 1, 1995).

This enhancement has a much traveled history in the Guidelines. It first appeared with the initial promulgation of the Guidelines in 1987 at S 2B1.2(b)(2)(A). As of January 1988, this language was relocated within the same section at S 2B1.2(b)(3)(A), where it remained until November 1, 1990. See U.S.S.G. App. C., amend. 8. As of that date it was again moved within the same section to S 2B1.2(b)(4)(A). See U.S.S.G. App. C., amend. 312. Finally, as of November 1, 1993, U.S.S.G. S 2B1.2 was deleted and consolidated with U.S.S.G. S 2B1.1. From that point until the present this provision has remained in that location. See U.S.S.G. App. C., amend 481.

As originally promulgated, the section spoke only of "selling stolen property." The Commission amended it in November 1989 to add the words "receiving of" immediately before this language. See U.S.S.G. App. C., amend. 102 (Nov. 1, 1989).

for the four point "in the business" enhancement. King, 21 F.3d at 1306. We turned to the First Circuit's decision in United States v. St. Cyr, 977 F.2d 698 (1st Cir. 1992), which set out the "totality of the circumstances" test. King, 21 F.3d at 1306. The St. Cyr court's approach placed "particular emphasis on the regularity and sophistication of a defendant's operation." St. Cyr, 977 F.2d at 703. We explained that "regularity of conduct is one universal thread in virtually all legal definitions of business." King, 21 F.3d at 1307 (quoting St. Cyr, 977 F.2d at 703-04). We further elaborated that where the government offers proof only of a defendant's irregular and occasional sales, it must also provide "evidence upon which to base a conclusion that . . . irregular and occasional sales underrepresented the scope of his criminality or the extent to which he encouraged or facilitated other crimes." Id. at 1308.

Cottman, however, argues that the enhancement was improperly applied to him. Indeed, the Probation Office did not include the "in the business" enhancement in computing Cottman's Guidelines offense level.8 Cottman first maintains that he was nothing more than a "low level delivery boy." Cottman claims that he merely obtained the cable boxes for resale from an Englishman named "Roger" and that the sentencing enhancement is inapplicable because Cottman was merely a middleman to Roger, the true fence. To support this contention, Cottman asks rhetorically why, if he was the "mastermind" of the scheme, did he only remove the serial numbers from the outside of the cartons, leaving the serial numbers actually attached to the cable boxes for later removal.

Cottman's implicit assumption that the "in the business" enhancement requires proof that he was the leader, organizer, or driving force behind the operation is

_____

8. The Pre-Sentence Investigative Report prepared by the Probation Office imposed only the two point sentencing enhancement for the commission of an offense involving more than minimal planning. See PSI P 34 (citing U.S.S.G. S 2B1.1(b)(4)(a)). The Probation Office, over the Government's objection, declined to apply the four point enhancement of U.S.S.G. S 2B1.1(b)(4)(B), citing a lack of evidence that Cottman had committed other acts of buying or selling stolen property. See Addendum to PSI, at 18-19.

misguided. Nothing in language, commentary, or amendment history of U.S.S.G. S 2B1.1(b)(4)(B) suggests that to earn the enhancement the defendant must be the criminal "mastermind" behind the scheme. Nor does Cottman produce any case law to this effect. Indeed, the Sentencing Guidelines already provide for a two point enhancement "[i]f the defendant was an organizer, leader, manager, or supervisor of any criminal activity." U.S.S.G. S 3B1.1(c) (Nov. 1, 1995). Thus, even if Cottman were merely a "delivery boy" for the "true fence," his involvement could be sufficient to warrant the enhancement.

Second, Cottman asserts that the three transactions in which he participated do not establish a pattern of trafficking in stolen goods with sufficient regularity to support the enhancement. According to Cottman, the record does not support the conclusion that he trafficked in stolen cable boxes on occasions other than those for which he was convicted. He dismisses his statement that he regularly received up to 300 cable boxes per week as mere puffery designed to impress his fellow conspirators. Cottman's position is, however, belied by the facts adduced at sentencing. Cottman's boasting about his history of trafficking in illegal cable boxes, captured as it was on video and audio tape, is a sufficient foundation from which the district court could have concluded that he had previously engaged in fencing activities. See, e.g., United States v. Rosa, 17 F.3d 1531, 1551 (2d Cir. 1994), (approving of application of enhancement where inter alia, defendant "made clear that these were not hisfirst transactions"); United States v. Russell, 913 F.2d 1288, 1294 (8th Cir. 1990) (same, where, inter alia, defendant made "statement to an informant that he could supply stolen checks, jewelry, and credit cards").

Implicit in this argument is Cottman's belief that the sentencing enhancement cannot stand without proof that he participated in transactions other than the three which underlie his conviction. However, even if we were to assume that the district court had before it proof only of the three transactions of the conspiracy conviction, we would still uphold the district court's application of the "in the business" enhancement. Contrary to Cottman's suggestion,

11

it is not the law in this Circuit that the enhancement cannot lie absent proof that the defendant has previously engaged in "fencing" activities.

Our decision in King is not to the contrary.9 There we merely distinguished a Fifth Circuit decision which made the broad statement that an "in the business enhancement" does not require a finding that a defendant has previously engaged in the fencing of stolen property. See King, 21 F.3d at 1306-07 (citing United States v. Esquivel, 919 F.2d 957, 960 (5th Cir. 1990)). We did not, however, hold that a defendant must in all cases have been involved in previous illicit transactions to warrant the enhancement.

Other Circuits have held that the enhancement remains appropriate without proof of past sales of stolen property. See, e.g., United States v. Sutton, 77 F.3d 91,93-94 (5th Cir. 1996) (holding that "a criminal can be `in the business' of fencing even though this is his first time to fence); United

_____

9. We had no occasion in King to consider the merits of the "fence" test developed by the Seventh Circuit and since adopted by the First, Fifth, and Sixth Circuits. See United States v. Braslawsky, 913 F.2d 466, 468 (7th Cir. 1990); United States v. McMinn, 103 F.3d 216, 219-21 (1st Cir. 1997); United States v. Warshawsky, 20 F.3d 204, 214-15 (6th Cir. 1994); United States v. Esquivel, 919 F.2d 957, 960 (5th Cir. 1990). This test limits application of S 2B1.1(b)(4)(B) to a "professional fence and not
a person who sells property that he has already stolen." Braslawsky, 917 F.2d at 468. Although some Circuits have described the "totality of the circumstances" approach, upon which this Court relies, as a "competing test," see, e.g., United States v. Peysano, 104 F.3d 191, 192 (8th Cir. 1997), nothing we said in King forecloses us from requiring in the future that a defendant be a "fence" for the enhancement to apply. Indeed, the First Circuit, which formulated the"totality of the circumstances" test, has recently indicated that proof that a defendant was in the business of receiving and selling stolen property is a prerequisite to the four level increase. See McMinn, 103 F.3d at 222.

Moreover, we have no need to revisit the question here. Cottman does not contend that he was the "thief," and there is ample evidence that the majority of cable boxes, sold by Cottman, were actually pilfered by others. Cf. McMinn, 103 F.3d at 222 ("Nothing prevents a professional thief from also conducting a fencing operation of sufficient size and continuity to qualify for the ITB enhancement; criminals, too, may have more than one line of business.") (dictum).

12

States v. Salemi, 46 F.3d 207, 210-11 (2d Cir. 1995). But see United States v. Connor, 950 F.2d 1267, 1275 (7th Cir. 1991) (suggesting that a defendant must have "engaged in sufficient illegal conduct which is similar to the instant offense").

The preponderance of the evidence here clearly establishes that Cottman filled a "fencing" role, and thereby created a market for those who would steal cable boxes by force or stealth. Indeed, Cottman even admitted that he took jobs in cable companies for the express purpose of encouraging people within those companies to steal cable boxes for him. PSI P 24.

The Government also asserts that "lack of regularity can be made up for in a given case by a strong showing of sophistication." Although we do not address this point in King, the First Circuit's decision in St. Cyr, upon which King draws heavily, speaks to it:

> We can easily imagine situations in which a fencing business, although very much a business, has been recently launched and therefore traces no historical pattern. In order to distinguish a new-to-the-business fence from an amateur, however, the government must at least offer a meaningful proxy for regularity, say, by showing that the operation crossed a threshold of sophistication and commitment.

St. Cyr, 977 F.2d at 704. This conclusion is consistent with King's holding that the government can sustain application of the enhancement, where sales are only "irregular or occasional," if the sales underrepresent the true "scope of the defendant's criminality or the extent to which he encouraged or facilitated other crimes." King, 21 F.3d at 1308.

There is abundant evidence that the operation in which Cottman took part was run with a large measure of professionalism. In the Government's recordings, Cottman extensively discusses the preparations he put into developing sources. After his arrest, Cottman admitted that he had taken jobs with cable companies in order to cultivate contacts who would acquire boxes for him. Those contacts were sophisticated enough to manipulate

13

computer systems at the cable companies to delete the stolen boxes from inventory. And, notwithstanding Cottman's ill-considered choice to ask the UCA to delete the serial numbers for him, Cottman demonstrated an awareness of measures which would help to elude detection.

Finally, Cottman argues that the district court should have given greater weight to the fact that he has held down legitimate employment in the cable industry for many years. Asserting that he "clearly is not a millionaire," Cottman suggests that his lifestyle and employment is inconsistent with the criminal history attributed to him. However, the fact that a defendant continues to hold down a legitimate job does not foreclose an enhancement. See, e.g., St. Cyr, 977 F.2d at 703 ("In searching for evidence of regularity, we do not suggest that the selling of stolen property must be the dominant source of a defendant's income before his felonious activities become sufficiently prominent to be regarded as a business."). The district court's incredulity was warranted here since Cottman's legitimate line of business also neatly facilitated his ability to obtain illegal cable boxes. See PSI P 24.

In sum, the district court did not err in imposing the U.S.S.G. S 2B1.1(b)(4)(B) enhancement. The evidence easily supports the characterization of Cottman's activities as regular and sophisticated.

C. Restitution of the Government's "Buy Money"

Cottman also disputes the district court's imposition, as a condition of supervised release, of an order requiring him to make restitution to the FBI for the money it paid him to acquire the illegal cable boxes. Cottman argues that "the Government voluntarily spent the money to buy the boxes," and therefore "was not the victim of the incident."

In the district court, the Government sought restitution to the FBI as a condition of Cottman's supervised release. The Government proffered alternate rationales for this order. First, the Government argued that its request could be sustained under the Victim Witness Protection Act

14

(VWPA), 18 U.S.C. S 3663 to 3664 (1985 & supp. 1995).10
Second, the Government asserted that the supervised
release statute, 18 U.S.C. S 3583 (1985 & supp. 1995),
provided an independent basis for an order of restitution.
See Dep't of Justice Letter of July 10, 1996, Appendix at
25-32.

The district court declined to order restitution under the
VWPA, finding that the FBI was not a "victim" of Cottman's
offense within the meaning of the Act. Appendix at 44-46.
However, the district court then proceeded to find that
Cottman could be required to reimburse the Government's
buy money under the supervised release statute. The
district court ruled from the bench that, pursuant to 18
U.S.C. S 3583(d), Cottman would be ordered to repay the
FBI as a condition of his supervised release since this
condition involved "no greater deprivation of liberty than is
reasonably necessary for the purposes of affording adequate
deterrence to criminal conduct." Appendix at 50.

The district court chose not to award restitution under
the VWPA because the prevailing view is that ordinarily the
Government cannot be a "victim" under the VWPA when its
losses were incurred as a result of its having provided the
"buy" money used in a government sting which led to the
defendant's arrest.11 See Appendix at 46 ("[T]he FBI, I find,
is not a victim of defendant Cottman's offense and the

_____

10. The Mandatory Victims Restitution Act of 1996, enacted as Tit. II,
Subtitle A, of the Antiterrorism and Effective Death Penalty Act of 1996
(AEDPA), Pub. L. No. 104-132, Apr. 24, 1996, 110 Stat. 1227,
substantially revised the restitution scheme. Its provisions are not,
however, directly applicable to this case. AEDPA Subtitle B contains an
effective date provision providing that "[t]he amendments made by this
subtitle shall, to the extent constitutionally permissible, be effective
for
sentencing proceedings in cases in which the defendant is convicted on
or after the date of enactment of this Act." AEDPA S 211. Cottman
entered a plea of guilty on March 7, 1996, while AEDPA was not signed
into law until April 24, 1996.

11. See, e.g., United States v. Meacham, 27 F.3d 214, 218-19 (6th Cir.
1994); United States v. Salcedo-Lopez, 907 F.2d 97, 98 (9th Cir. 1990);
Gall v. United States, 21 F.3d 107, 111-12 (6th Cir. 1994); United States
v. Daddato, 996 F.2d 903, 905 (7th Cir. 1993); United States v. Findley,
783 F. Supp. 1123, 1127 (N.D. Ill. 1991).

$34,740 [sic] is not recoverable under the VWPA.");
Appellee's Br. at 26 (conceding in respect to restitution
orders requiring repayment of buy money as a condition of
probation, "such disgorgement is arguably improper under
the restitution statutes, given that they focus squarely on
compensation to victims and not punishment").

We have not yet had to determine whether the VWPA
allows restitution to the government for funds expended in
a sting, such as we have here.12 However, the other circuits,
which have considered the question, have held that
investigative costs and voluntary expenditures by the
government to procure evidence are not losses. See, e.g.,
United States v. Khawaja, 118 F.3d 1454, 1460 (11th Cir.

_____

12. Although the government suggests otherwise, we have issued no
decisions inconsistent with the view that costs of prosecution generally
are not recoverable by the government. In the first case cited by the
government, United States v. Hand, 863 F.2d 1100 (3d Cir. 1988), the
appellant had pled guilty to one count of criminal contempt arising out
of improper contact she had had, while a juror in a criminal case, with
a defendant. Id. at 1101–02. As a result of her improper contact, the
trial
judge was forced to vacate the convictions of six defendants. Id. at 1102.
The district court made it a condition of the appellant's probation that
she make restitution to the government for the costs of reprosecuting the
five defendants whose convictions had been voided. Id. We concluded
that the United States Attorneys' Office was a victim directly affected by
the appellant's criminal conduct since resources expended in obtaining
the original convictions were wasted. Id. at 1103–05.

In the second case, United States v. Kress, 944 F.2d 155 (3d Cir.
1991), the appellant had been convicted for his role in a scheme to
defraud the United States Department of Defense on several contracts to
provide the military with educational and employment training
programs. Id. at 157 & n.1. The appellant, as a condition of probation,
was ordered to repay the government $300,000 overfive years with
interest at a rate of 18% per annum. Id. at 157. We concluded that
"defendants may be required under the VWPA to pay restitution to
federal governmental bodies as a special condition of probation." Id.
(citing Hand). Further, we held that the interest was properly imposed
since it facilitated the Act's goal of fully compensating the victim, here
the government. Id. at 159–60.

Both of these cases are, however, distinguishable since in each the
government was an unwilling participant in the defendant's criminal
activity and suffered direct and substantial losses therefrom.

16

1997); United States v. Gibbens, 25 F.3d 28, 36 (1st Cir. 1994); United States v. Meacham, 27 F.3d 214, 218 (6th Cir. 1994); United States v. Salcedo-Lopez, 907 F.2d 97, 98 (9th Cir. 1990). We will follow this well considered construction of the VWPA and hold that, when the government chooses to apprehend offenders through a sting operation, the government is not a "victim" under the provisions of the VWPA.

However, the district court awarded restitution, not under the VWPA, but under 18 U.S.C. S 3583(d).13 Section 3583(d) of the supervised release statute authorizes the imposition of certain of the discretionary conditions of probation, set forth in 18 U.S.C. S 3563(b) (1985 & supp. 1995). When Cottman was sentenced, S 3563(b)(3) permitted the district court to order a defendant as a condition of probation to "make restitution to a victim of the offense under sections 3663 and 3664 . . .."

_____

13. In imposing "restitution" as a condition of supervised release, the district court did not indicate what portion ofS 3583(d) it was referring to. Section 3583(d) grants the sentencing judge discretion to:

> order, as a further condition of supervised release, to the extent that
> such condition--
>
> (1) is reasonably related to the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), and (a)(2)(D);
>
> (2) involves no greater deprivation of liberty than is reasonably necessary for the purposes set forth in section 3552(a)(2)(B), (a)(2)(C), and (a)(2)(D); and
>
> (3) is consistent with any pertinent policy statements issued by the Sentencing Commission pursuant to 28 U.S.C.S 994(a);
>
> any condition set forth as a discretionary condition of probation in
> section 3563(b)(1) through (b)(10) and (b)(12) through (b)(20), and any other condition it considers to be appropriate.

18 U.S.C. S 3583(d) (emphasis added). The district court may, therefore, have been referring to the "discretionary conditions of probation" prong or to the "any other condition" catch-all prong. Since, however, the condition of probation being imposed was "restitution," we conclude, for the reason we state infra, that "restitution" must have been imposed under S 3563(b).

17

The District Court employed the term "restitution" when imposing repayment at the sentencing hearing. Appendix at 59. The amount of the repayment is also entered under "Restitution" on the Judgment form. Appendix at 16. Because this condition of supervised release was specified to be "restitution" and because it is S 3563(b) which permits the imposition of "restitution" as a condition of supervised release, we conclude from the use of this term that the order of restitution must follow the provisions of S 3563. Otherwise, the "catch-all" exception prong of S 3583(d) would swallow the rule.

For this reason, we conclude that the order incorporated by reference S 3563(b)'s terminology "restitution to the victim" (emphasis added). Thus, we again are faced with the requirement that restitution be made to a "victim." We cannot see how the FBI can be a "victim" under S 3563(b) if it is not a "victim" under the VWPA. We feel obliged to conclude that the statutory provisions are parallel in their definition of "victim." See Gall v. United States, 21 F.3d 107, 111 (6th Cir. 1994) (holding that "S 3583(d) via its reference to . . . S 3563(b)(3) requires restitution to conform with provisions of the VWPA").14

On remand, it may be that other victims of Cottman's offense can be ascertained. However, for the reasons stated above, we hold that the FBI was not a victim and, as a result, the conditions of Cottman's supervised release cannot include a requirement that he pay restitution to the FBI.15

_____

14. The dissent voices the concern that "a person who knowingly sells stolen merchandise should not be permitted to profit from the sale. . . . The taxpayer . . . should not have to bear the cost of `buy money.' The . . . money involved has gone into the defendant's pocket and to the extent practicable should be recovered." Dissent at 26. We are not unsympathetic with this point of view. We note, however, that in future cases the district court may consider imposing afine which is equivalent to the amount of any buy money a defendant has received from the Government. See U.S.S.G. S 5E1.2.

15. Because the district court may choose to consider other conditions of supervised release, we remand rather than reverse. We note, however, that at sentencing the district judge noted that Cottman did not have the ability to pay a fine. Appendix at 59.

18

III. Conclusion

In view of the aforesaid, Cottman's judgment of sentence will be affirmed insofar as it imposed a term of imprisonment with an enhancement under S 2B1.1(b)(4)(B). We will, however, vacate the conditions of supervised release portion of the judgment of sentence, imposing the condition of payment of restitution to the FBI. We will remand this case to the district court for resentencing.

19

LUDWIG, District Judge, concurring and dissenting:

I join in the majority's decision on lack of mootness and affirmance of the application of the four level "in the business" Guidelines enhancement. U.S.S.G. S 2B1.1. I respectfully dissent from its decision to vacate the condition of supervised release requiring repayment to the government of $32,420 in "buy money" provided to defendant by the FBI. Defendant received those monies, in various installments, from an undercover agent in exchange for 231 stolen TV boxes – the subject matter of the conspiracy charge to which defendant pleaded guilty. The crime occurred in 1995, and the defendant was sentenced on July 22, 1996.

The majority holds that restitution of "buy money" is not an authorized condition of supervised release under the Victim Witness Protection Act of 1982, 18 U.S.C. SS 3663–3664 (1985 & supp. 1995) or the supervised release statute, 18 U.S.C. S 3583 (1985 & supp. 1995). Its reasoning is that the expenditure of "buy money" is a cost of law enforcement and does not qualify the government as a "victim" – the traditional prerequisite of restitution. I agree with that analysis as relates to the VWPA.[1] However, I do not believe it is necessary to decide that issue in applying the supervised release statute to this case. First, the sentencing judge did not intend to order "restitution" in the victim–related sense of the word – which is the underlying premise of the majority's conclusion. Second, I would hold that the repayment of "buy money" is authorized as a discretionary condition of supervised release under 18 U.S.C. S 3583(d)(3).

_____

1. 18 U.S.C. SS 3663–3664. See United States v. Gibbens, 25 F.3d 28, 32 (1st Cir. 1994) ("[T]he government is not a`victim' for purposes of the VWPA [and may not be awarded restitution] to the extent that it incurs costs in the clandestine provocation of a crime that, if carried to fruition
under ordinary circumstances, would not directly harm the government."); accord United States v. Meacham, 27 F.3d 214, 218 (6th Cir. 1994); United States v. Salcedo–Lopez, 907 F.2d 97, 98 (9th Cir. 1990).

20

I

The sentencing judge stated, after discussing the victim-restitution cases:

> [T]he FBI, I find, is not a victim of defendant Cottman's offense and the "buy money" is not recoverable under the VWPA. Therefore, I agree with defendant's objection to the award of restitution to the FBI. Restitution should be made to the owners of the cable boxes .... I'm ordering that the boxes be returned to their rightful owners as restitution.

Appendix at 46-47. The sentencing judge then reviewed the "buy-money" decision in United States v. Daddato, 996 F.2d 903 (7th Cir. 1993) and concluded that authority for a repayment order was conferred by the supervised release statute provision: "any other condition [the court] considers to be appropriate." 18 U.S.C. S 3583(d)(3).

The sentencing judge - as the majority stresses- referred at times to the repayment as "restitution" and the repayment is so characterized on the judgment of sentence form. Nevertheless, the judge's sentencing statement unmistakably shows the intent to follow Daddato and to exercise "any other condition" discretion, not to order restitution to the FBI as a victim. Appendix at 47-50, 59. The significance of the distinction is more than semantic. By incorporating by reference the conditions authorized in the probation statute, the supervised release statute also empowers the sentencing judge to order "restitution to the victim." 18 U.S.C. S 3563(b)(3). Under the VWPA cases, that provision, by its own terminology, could not be utilized to order a repayment of "buy money." Despite the finding of the sentencing judge that the FBI was not a "victim" and was not entitled to victim-related "restitution," the majority conclusively infers that the condition was imposed under S 3563(b)(3) and was, accordingly, invalid.

Moreover, the idea of restitution, which historically has involved redress to a victim, has been evolving to include victimless reparations.2 The sentencing judge's sporadic use

_____

2. The VWPA amendment of 1996, 18 U.S.C. S 3663(c)(1), includes restitution of "community harm" in drug cases where there is no "identifiable victim."

21

of "restitution" in a non-victim-related sense to refer to the repayment of "buy money" has good precedent. In Daddato, now Chief Judge Posner's decision characterizes the repayment of "buy money" as "in the nature of restitution," observing that "[we] need not determine whether such an order is also classic `restitution'...." 996 F.2d at 903, 905. See United States v. Brooks, 114 F.3d 106, 108 (7th Cir. 1997) ("In Daddato, after noting that an order to repay buy money as "restitution" under the[VWPA] was not cricket, we found that such an order would nevertheless pass muster as a condition of supervised release" (bold in original)). The majority's predicate that the sentencing judge must have intended to act under 18 U.S.C. S 3563(b) simply is not well founded. The sentencing judge was well aware of both the traditional compensatory and the victimless, or nontraditional, meaning of "restitution" – and clearly did not believe he was invoking S 3563(b).3

_____

3. After the government's Petition for Panel Rehearing was granted, the majority modified its opinion to say that the sentencing judge "did not indicate what portion of 18 U.S.C. S 3583(d) it was referring to..." – the "discretionary conditions of probation" prong or the "any other condition" catch-all prong. Majority at note 13. This, in my view, mischaracterizes the clear record. The sentencing judge read into the record a substantial excerpt of Daddato including the citation of the "any other condition" catch-all prong of S 3583(d) as the statutory basis for its holding. Appendix at 48. He also stated that the government relied on Daddato and that Daddato "relied on the catch-all phrase of the supervised release statute." Id. at 47. His ruling was that "the government's request is granted and defendant will be ordered to repay the FBI the amount of " the "buy money." Id. at 50. In so ruling, he did not refer to "restitution," id., albeit he did elsewhere.

Moreover, the parties in their argument to us had no doubt that the sentencing judge intended to invoke the "any other condition" clause. As set forth in appellant's brief, "the United States ... relied upon the `catch-all' provision of 18 U.S.C. Sec. 3583(d) and United States v. Daddato...." Appellant's brief at 8. Appellant did not resort to the majority's "discretionary condition" distinction – but instead specifically challenged the sentencing judge's utilization of the "catch-all" prong. The very ground that the majority regards as not before us was argued by both sides as the basis for the sentencing judge's decision.

On remand, the availability of the "catch-all" provision has at this point not been ruled on, and it is unclear whether the sentencing judge

22

II

Daddato dealt with precisely the same question as is presented here:

> Pursuant to his plea of guilty, James Daddato was convicted of ... selling hallucinogenic mushrooms and sentenced to 16 months in prison to be followed by three years of supervised release. His appeal challenges one of the conditions of supervised release: that he repay the $3,650 that he received from law enforcement officers in payment for mushrooms that they bought from him in order to obtain conclusive evidence of his guilt. The statute governing supervised release empowers the sentencing judge to impose as a condition of such release any condition authorized as discretionary condition of probation plus "any other condition it considers to be appropriate." 18 U.S.C. S 3583(d). Obviously the language is broad enough to encompass the requirement that the defendant make good the government's "buy money"; nor could the imposition of such a requirement be thought an abuse of discretion – it merely asks the defendant (if he is financially able, once his release from prison enable him to obtain a paying job) to make good the expense to which he put the government by violating the laws that prohibit drug trafficking in a selected subset of mind-altering drugs.

996 F.2d at 903.

_____

may now order repayment of the "buy money" so long as he explicitly states that he is using the "catch-all" provision and does not mention the word "restitution." At a minimum, I would have remanded to permit the sentencing judge to re-clarify his intent on this subject in view of the majority's concerns.

Given the majority's modification of the language in its original decision, Part III of my dissent may have little remaining significance. Nevertheless, I have not removed Part III because it emphasizes the need of the sentencing judge to be able to order the return of "buy money" as a condition of supervised release under the "any other appropriate condition" provision of S 3583(d).

The opinion then rejects the argument that repayment of "buy money" is beyond the sentencing judge's power because "any other condition" must be comparable, by virtue of "ejusdem generis," to the 20 specific conditions that precede it. Daddato explains that the return of "buy money" is comparable to, albeit not the same as, traditional "restitution."

> An order to repay the government's "buy money" is similar in requiring the defendant to convey something of value to the community, rather than to his victims (if any there be) specifically. State v. Connelly, 143 Wis. 2d 500, 421 N.W.2d 859 (App. 1988).

> * * * *

> On the one hand, it seems unrealistic to describe the defendant as having wrongfully taken money eagerly tendered to him so that he could incriminate himself. On the other hand, it was money that he obtained through criminal activity and therefore had no right to keep. No matter. The list in section 3563(b) is not limited to restitution, or even to conditions that resemble restitution (which this, at the very least, does); it is enough that the order to repay the buy money is of the same general kind as the items in the list, and it is.

996 F.2d at 905 (bold in original).

The year after Daddato, a panel of the Sixth Circuit Court of Appeals granted S 2255 relief where a supervised release condition to repay "buy money" was imposed as to four drug charges, although three of the charges had been dismissed in exchange for the defendant's guilty plea to the fourth. Gall v. United States, 21 F.3d 107 (6th Cir. 1994). The decision, after confining "restitution" as a condition of supervised release to crimes "charged and convicted," described the second part of its holding: "the government is not a victim to which a district court may order a defendant to pay restitution for the purpose of recovering drug `buy money' and other costs of investigation voluntarily paid out." 21 F.3d at 108 (bold in original). In much the same way as our majority, which cites Gall for this point, it ignores Daddato and equates repayment of "buy money"

24

with traditional "restitution"; it then summarily conflates S 3563(b)(3) with the VWPA because of the incorporation by reference of S 3563(b)(3) – "restitution to the victim."

The concurrence in Gall, however, focuses on Daddato and criticizes it for having resorted to the "any other condition" provision of S 3583(d). Interestingly, the rationale is not that the restoration of "buy money" must be classified or construed to be the same as victim-related restitution.

> Under S 3583(d)(2) ... a sentencing judge can only order additional "appropriate" conditions of supervised release that "involve no greater deprivation of liberty than is reasonably necessary for the purposes of: (1) affording adequate deterrence to criminal conduct; (2) protecting the public from further crimes of the defendant; and (3) providing the defendant with ... training ... care ... or treatment....

> \* \* \* \*

> Ordering a criminal defendant, as a condition of supervised release, to repay the government's buy money or other investigative costs deprives the defendant of liberty during the period of supervised release, yet does not advance any of these three purposes.... Indeed, such a deprivation of liberty ... could actually encourage the defendant to commit further crimes as a means of repaying such an onerous financial burden.

21 F.3d at 112-113.

In the instant sentencing, the judge quoted the above-portion of the concurrence and stated:

> I disagree with Judge Jones' reasoning. This is because I find that ordering the defendant, pursuant to S 3583(d) to repay the FBI as a condition of his supervised release, even though restitution of this money to the FBI is not authorized under the VWPA, involves no greater deprivation of liberty than is reasonably necessary for the purposes of affording adequate deterrence to criminal conduct.

25

Appendix at 50.

In my view, the sentencing judge correctly overruled defendant's "buy money" objection that was based on the Gall concurrence. The repayment of "buy money" imposes no greater deprivation of liberty and is no less a deterrent of criminal conduct than traditional restitution and other specifically authorized conditions of supervised release.

III

The broader question presented by this case is the nature and extent of the sentencing options that are statutorily authorized to achieve the objectives of sentencing. Under 18 U.S.C. S 3553, the sentencing judge is directed to consider, in part –

>        (1) the nature and circumstances of the offense an d characteristics of the defendant;
>
>        (2) the need for the sentence imposed –
>
>         (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

Given these purposes, it would seem to be beyond dispute that a person who knowingly sells stolen merchandise should not be permitted to profit from the sale. The provision of the supervised release statute that authorizes "any other condition [the court] considers to be appropriate," is in addition to – and not synonymous with or subordinate to – the condition authorizing victim-related restitution. The costs of law enforcement are paid from taxes, and criminal defendants are not required to reimburse the government for their day in court. The taxpayer, however, should not have to bear the cost of "buy money." The difference is that the money involved has gone into the defendant's pocket and to the extent practicable should be recovered. This is a self-evident corollary of "respect for the law" and "just punishment."

The majority's decision today puts an incongruous and unnecessary limitation on the power of the sentencing judge to effectuate the legislatively mandated goals of sentencing.

26

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit