**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
———

No. 12-1519
———

UNITED STATES OF AMERICA

v.

JAIME DURAN,
Appellant

———

12-1534
———

UNITED STATES OF AMERICA

v.

CESAR CAMACHO-ROSALES,
Appellant

———

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Criminal Nos. 2-10-cr-00104-001; 2-10-cr-00104-003)
District Judge: Honorable Lawrence F. Stengel
———

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
June 11, 2013

Before: SCIRICA, HARDIMAN and VAN ANTWERPEN, *Circuit Judges*

(Filed: June 12, 2013)

OPINION OF THE COURT

VAN ANTWERPEN, *Circuit Judge*

Jaime Duran ("Duran") pleaded guilty to one count each of drug offenses under 21 U.S.C. §§ 846 and 841(a)(1), and a related offense under 21 U.S.C. § 843(b).  Cesar Camacho-Rosales ("Camacho-Rosales") pleaded guilty to one count each of drug offenses under 21 U.S.C. §§ 846 and 841(a)(1).[1]  Duran and Camacho-Rosales both challenge the District Court's calculation of their sentences under the Sentencing Guidelines.

## I.  Duran's Appeal

### A.  Duran's Conduct

The facts regarding Duran's conduct are not in dispute.  In March 2007, Duran met with an individual known as K.W., a Philadelphia-area drug dealer.  After the meeting, Duran and Alberto Torres ("Torres") agreed to supply K.W. with kilogram-weight quantities of cocaine from California.  Duran told K.W. that he could supply K.W. with cocaine, beginning with loads of twenty-five kilograms.  Duran informed K.W. that Torres would be K.W.'s contact in the Philadelphia area, and instructed K.W. to arrange housing for Torres.  K.W. did so.

---

[1] For both defendants, the violations of 21 U.S.C. §§ 846 and 841(a)(1) involved, respectively, conspiracy to distribute and distribution of five or more kilograms of cocaine.  Section 843(b) of Title 21 of the United States Code punishes use of a communication facility in connection with the commission of a felony.

In spring 2007, K.W. received the first shipment of cocaine from Duran. For this first transaction, and all subsequent transactions, K.W. drove to Delaware, where he would meet Torres. To conduct the transactions, K.W. and Torres would not remove the cocaine from Torres's car; rather, they would simply switch cars, with K.W. driving away in the car containing the cocaine. A few months later, the arrest of another dealer caused shipments from Duran to K.W. to slow down. K.W. then traveled to California to meet with Duran at Duran's residence to discuss future shipments. Duran told K.W. that shipments would resume shortly if K.W. agreed to assume a portion of the debt Duran incurred when the other drug dealer was arrested. K.W. grudgingly agreed to this arrangement. Shipments began anew, at first in quantities of twelve to fifteen kilograms and then increasing to forty to fifty kilograms, and continued until K.W.'s arrest in 2009. After K.W.'s arrest, Duran contacted K.W.'s wife to attempt to collect money that K.W. owed to Duran for approximately sixty-six kilograms of cocaine.

Unbeknownst to Duran, an individual with whom he began meeting after K.W.'s arrest was a cooperating witness for the FBI ("CW"). Beginning in November 2009, Duran conducted telephonic negotiations with the CW regarding collection of K.W.'s debt, all of which were recorded by the FBI. In January 2010, Duran, Torres, and Camacho-Rosales traveled to Philadelphia to meet with the CW to reestablish distribution of cocaine from California to Philadelphia. Camacho-Rosales traveled to Philadelphia from California at the request of Duran and Torres.

During one meeting, Torres drove Duran to meet with the CW. While Duran met with the CW and discussed the distribution scheme, Torres waited in the car. At a later

3

meeting, Duran met the CW alone, to discuss the quantities of cocaine Duran would supply to the CW, and the CW's efforts to recoup the money for Duran from K.W.'s customers. The next time they met, Duran and Camacho-Rosales drove in one car, and Torres drove separately in a rental car. Duran informed the CW he needed the rental car because he needed someone to follow him to protect him as he drives. Eventually, Duran instructed the CW to meet at a parking lot in Delaware; the CW called Duran when he arrived. Duran told the CW to park next to Torres, and Torres placed a box full of cocaine in the CW's car.

At the last meeting, Duran once again drove with Camacho-Rosales, while Torres followed in the rental car. The purpose of this meeting was for Duran to collect payment from the CW for the cocaine Duran and Torres had earlier provided. While Duran and Camacho-Rosales met with the CW inside a restaurant, Torres waited outside in his vehicle. Inside, Duran discussed the CW's payment of the money he owed him, and his plans for paying back his (Duran's) suppliers, as well as the next shipment of cocaine. The three were arrested in the parking lot of the restaurant.

In Duran's Pre-Sentence Report ("PSR"), the Probation Office recommended a three-level upward adjustment pursuant to U.S.S.G. § 3B1.1(b).[2] The District Court expressed doubts as to the number of participants in the criminal activity, but found that Duran had "leadership, and management, and supervisory roles in this conspiracy," and

---

[2] "If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by **3** levels."

therefore applied a two level adjustment under U.S.S.G. § 3B1.1(c).[3] Duran challenges

this determination on appeal.

## B. Duran's Challenge[4]

We review a District Court's determination of "whether the facts 'fit' within what

the Guidelines prescribe" for clear error. *United States v. Richards*, 674 F.3d 215, 219-

20 (3d Cir. 2012).[5]

Duran argues the District Court erred in applying the leadership enhancement. He

cites to Application Note 2, which states that "[t]o qualify for an adjustment under this

section, the defendant must have been the organizer, leader, manager, or supervisor *of*

*one or more participants*." U.S.S.G. § 3B1.1 cmt. n. 2 (emphasis added). This is

consistent with our precedent stating that "for § 3B1.1 to apply, 'the defendant must have

exercised some degree of control over others involved in the commission of the

---

[3] "If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by **2** levels."

[4] The District Court had jurisdiction under 18 U.S.C. § 3231 and we have jurisdiction pursuant to 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

[5] Duran argues that because the facts are not in dispute, the issue is purely a legal one, and thus a *de novo* standard should apply. The Supreme Court explicitly rejected this argument in *Buford v. United States*, 532 U.S. 59, 63-64 (2001), and this Court did the same in *Richards*, 647 F.3d at 218. In *Buford*, the Court noted that considerations beyond the existence of factual disputes justified a deferential standard of review. For example, a district court's sentencing determination is entitled to deference because the district court deals with Guidelines calculations on a more regular basis and thus has an institutional advantage when making sentencing determinations. *Buford*, 532 U.S. at 64-65. Furthermore, if an issue is a fact-specific one, there is "limited value of uniform court of appeals precedent," which is one of the justifications for *de novo* review. *Id.* at 65-66. Bearing in mind these considerations, a deferential standard of review is appropriate.

5

offense.'" *United States v. Phillips*, 959 F.2d 1187, 1191 (3d Cir. 1992) (quoting *United States v. Fuller*, 897 F.2d 1217, 1220 (1st Cir. 1990)); *see also United States v. King*, 21 F.3d 1302, 1305 (3d Cir. 1994) ("The direction and control of others is a recurrent theme in legal definitions of the terms 'manager' and 'supervisor.'")

Duran claims (1) there is insufficient evidence that he had a leadership role in the conspiracy and (2) even if he had a leadership role, there is insufficient evidence that he exercised any leadership, managerial, or supervisory authority *over* another participant.

1.  Duran Was an "Organizer, Leader, Manager, or Supervisor"

Duran argues that the evidence only shows he was an "essential member" of the conspiracy, not an organizer, leader, manager, or supervisor. This claim fails.

Section 3B1.1 does not define "organizer," "leader," "manager," or "supervisor." This Court has determined that "a manager or supervisor is one who 'exercise[s] some degree of control over others involved in the offense.'" *United States v. Chau*, 293 F.3d 96, 103 (3d Cir. 2002) (quoting *Fuller*, 897 F.2d at 1220). The commentary to § 3B1.1 provides a list of factors for courts to consider when attempting to distinguish "a leadership and organizational role from one of mere management or supervision." U.S.S.G. § 3B1.1 cmt. n.4. Many of our sister Courts of Appeals consider these factors when determining whether § 3B1.1(c) applies. *See, e.g.*, *United States v. Skinner*, 986 F.2d 1091, 1096-97, n.1 (7th Cir. 1993) (considering Note 4 factors when analyzing application of § 3B1.1(c) and citing other Courts of Appeals that do the same). These factors include: "the exercise of decision making authority, the nature of participation in the commission of the offense . . . the degree of participation in planning or organizing

6

the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." U.S.S.G. § 3B1.1 cmt. n.4. Application of these factors demonstrates that Duran was a supervisor or manager.

Duran "exercised decision making authority" by dictating the amount of cocaine he would supply in each shipment, organizing and arranging meetings with the CW, negotiating with K.W. and later the CW, and establishing and directing the manner in which physical transfers of the cocaine would occur. "The nature of [his] participation in the offense" further supports this conclusion. As the individual who orchestrated the physical transactions between K.W. and Torres, and then the CW and Torres, and who conducted all of the meetings with the CW, Duran's participation in the conspiracy was significant. Similarly, his role in the negotiations and in structuring the transactions indicates he had a high "degree of participation in planning [and] organizing" the conspiracy. Finally, the fact that he ordered K.W. to provide housing to Torres, that he had Torres live in Philadelphia to serve as his liaison with K.W. while he (Duran) remained at the "headquarters" of the operation in California, and that he had Torres handle all of the physical transfers of cocaine on his behalf, indicates that Duran exercised "control and authority" over others.

   2. K.W. and Torres Were "Participants" Over Whom Duran Was a Manager

Duran argues that even if he was a manager or supervisor, the evidence does not establish that he exercised such authority *over* a participant, which is required by application note two of § 3B1.1. Duran argues that K.W. was not a participant because

7

he was simply a consumer and not a member of the conspiracy, and that Duran did not exercise authority over Torres because Torres was his equal within the conspiracy.

A participant is "a person who is criminally responsible for the commission of the offense, but need not have been convicted. A person who is not criminally responsible for the commission of the offense (*e.g.*, an undercover law enforcement office) is not a participant." U.S.S.G. § 3B1.1 cmt. n.1. This Court has determined that a seller providing drugs to a consumer for resale on credit "is sufficient evidence of a conspiracy" under 21 U.S.C. § 846. *United States v. Iglesias*, 535 F.3d 150, 156 (3d Cir. 2008). We also determined that "the fact that [defendant] invited [coconspirator] to Apartment A with drugs in plain view reflects a level of mutual trust consistent with conspiracy." *Id.*

In this instance, Duran provided bulk quantities of cocaine to K.W. on credit, in a relationship identical to that in *Iglesias*. Furthermore, the fact that, while conducting the physical transfers, K.W. and Torres did not merely transfer the cocaine and the money, but rather swapped cars, "reflects a level of mutual trust consistent with conspiracy." *Iglesias*, 535 F.3d at 156. Similarly, K.W. was instructed by Duran to provide housing for Torres, who was indisputably a member of the conspiracy; again this indicates a level of mutual trust beyond an arms-length buyer-seller relationship.

Duran mistakenly relies on cases from the Courts of Appeals for the Eighth Circuit and the Ninth Circuit to argue K.W. was not a participant. In *United States v. Jones*, the court assessed whether the defendant was an "organizer" or "leader" under U.S.S.G. § 3B1.1(a), not whether the defendant was an "organizer," "leader," "manager," or

8

"supervisor" under § 3B1.1(c).[6]  160 F.3d 473, 482-83 (8th Cir. 1998).  The court found that the defendant's role as a wholesale seller to a consumer who in turn sold to various other drug dealers did not establish that he was the "leader" or "organizer" of that consumer.  *Id.* at 483.  Not only was *Jones* concerned with the more stringent "leader" or "organizer" standard, it did not determine whether the consumer was a "participant." Therefore, it lends no support to Duran's argument that K.W. was not a participant.

Precedent from the Court of Appeals for the Ninth Circuit is similarly unhelpful. In *United States v. Egge*, the court *did* hold that "merely purchasing drugs from the seller, without more, does not qualify that customer as a participant for the purposes of the section 3B1.1 enhancement."  223 F.3d 1128, 1133 (9th Cir. 2000).  However, the court made clear that this rule only applied "[w]here the customers are solely end users of controlled substances."  *Id.*  Therefore, "to qualify as a participant, a customer must do more than simply purchase small quantities of a drug for his personal use.  The facts must support an inference that the seller knew or should have known that the customer would subsequently distribute the drugs to others outside his household."  *Id.*  Duran knew that when he was supplying K.W. with multiple shipments of twenty-five to fifty kilograms of cocaine, K.W. would "distribute the drugs to others outside his household."

Duran argues that even if K.W. was a participant, Duran did not act as K.W.'s "supervisor" or "manager."  This argument fails.  As described above, the essence of a

---

[6] Under the Guidelines, a "supervisor" or "manager" has less authority than an "organizer" or "leader." *See* U.S.S.G. § 3B1.1 cmt. n.4 ("In distinguishing a leadership and organization role from one of *mere management or supervision . . . .*" (emphasis added)).

supervisory or managerial relationship is whether the defendant "'exercise[s] some degree of control over others involved in the offense.'" *Chau*, 293 F.3d at 103 (quoting *Fuller*, 897 F.2d at 1220). Duran informed K.W. that he would be dealing with Torres and instructed K.W. to obtain housing for Torres in the Philadelphia area. K.W. followed both of these directives; he arranged for Torres's housing, and he transacted business directly with Torres. Furthermore, when the arrest of another drug dealer created an obstacle in the conspiracy, Duran decided to resume shipments to K.W. only if K.W. agreed to assume some of Duran's debt. This transaction demonstrates that Duran dictated the terms of the conspiracy, and K.W. obeyed those terms. By forcing K.W. to assume part of his debt, Duran "exercise[d] some degree of control" over K.W. This belies the notion that K.W. was a separate "entity," not beholden to Duran. Rather, this indicates an organization in which Duran was above K.W. in a vertical hierarchy, not adjacent to him in a horizontal relationship.

Finally, Torres was a participant over whom Duran exercised supervisory or managerial authority. Duran argues Torres was an equal, not an inferior, in the conspiracy. However, the fact that Torres served as Duran's driver to several meetings, that Torres waited outside while Duran conducted negotiations and meetings, that Torres drove a rental car behind Duran to protect Duran, that Torres went to the Philadelphia area to deal with K.W. while Duran remained near "headquarters" in California, and that Torres handled all of the physical transfers of cocaine on behalf of Duran, indicates that Duran exercised "some degree of control" over Torres.

10

Since K.W. and Torres were both participants in the criminal activity, and since Duran exercised supervisory or managerial authority over both of them, application of the § 3B1.1(c) two-level enhancement was not clear error.

## II. Camacho-Rosales's Appeal

### A. Camacho-Rosales's Conduct

At the request of Torres, Camacho-Rosales traveled to Philadelphia on January 25, 2010. In Philadelphia, Camacho-Rosales attended approximately three meetings with Torres, Duran, and the CW to discuss the distribution of cocaine from Torres, Duran, and Camacho-Rosales to the CW. On January 27, 2010, two days after arriving in the area, Camacho-Rosales, Torres, and Duran met with the CW to discuss the distribution of approximately 24 kilograms of cocaine to the CW. Camacho-Rosales drove Duran to this meeting, while Torres followed in a rental car. Later that day, Torres met with the CW and transferred 23.94 kilograms of cocaine into the CW's vehicle. On January 28, 2010, Camacho-Rosales again drove Duran to a meeting with the CW. Torres again followed in a rental car. Camacho-Rosales and Duran entered a restaurant to meet with the CW to obtain the CW's payment for the cocaine Duran, Torres, and Camacho-Rosales had provided the CW. The three were arrested outside of the restaurant.

Camacho-Rosales pleaded guilty to one count each of violating 21 U.S.C. §§ 846 and 841(a)(1). At his sentencing hearing, he raised several arguments for departure. On appeal, Camacho-Rosales raises two challenges to his sentence: (1) substantive due process was violated by the increase of his criminal history score, which rendered him

11

ineligible for the safety valve provision of U.S.S.G. § 5C1.2[7] and (2) he was entitled to an offense level reduction based on his limited participation in the conspiracy, pursuant to U.S.S.G. § 3B1.2.[8] The District Court rejected these arguments, but did grant a downward variance of one month, and sentenced Camacho-Rosales to the mandatory minimum of 120 months.[9] Camacho-Rosales appeals.

**B. Camacho-Rosales's Challenge**

Camacho-Rosales argues that the District Court violated substantive due process by assessing him one criminal history point for a misdemeanor conviction, and then assessing two additional points because Camacho-Rosales committed the instant offense while serving probation for the misdemeanor conviction. Due to the resulting criminal history score of three points, Camacho-Rosales was ineligible for the safety valve provision in U.S.S.G. § 5C1.2. If not for the additional two points, Camacho-Rosales argues, his Guidelines range would have been 108-135 months, twelve months below the mandatory minimum required by 21 U.S.C. § 841(b)(1)(A).[10] According to Camacho-

---

[7] This provision permits the District Court to sentence in accordance with the Guidelines, regardless of any statutory mandatory minimum, if certain conditions are satisfied, including: "the defendant does not have more than 1 criminal history point." U.S.S.G. § 5C1.2(a)(1).

[8] Under this provision, a defendant's offense level is decreased by four levels if he "was a minimal participant in any criminal activity" and by two levels "if the defendant was a minor participant in any criminal activity." U.S.S.G. § 3B1.2.

[9] The Guidelines range was 121 months to 151 months.

[10] Pursuant to this subsection, any person convicted of distributing five or more kilograms of cocaine is subject to a mandatory sentence of incarceration of ten years. Camacho-Rosales pleaded guilty to distribution of 23.94 kilograms of cocaine.

12

Rosales, his due process rights were violated because, under the Sentencing Guidelines, the penalty he suffers for committing the instant offense while on probation for commission of a misdemeanor is the same penalty applied to someone on probation for commission of a felony—an assessment of two additional history points. This argument fails.

A sentencing scheme will survive a due process challenge if it "bears a rational relationship to a legitimate governmental purpose."[11] *United States v. John*, 936 F.2d 764, 766 n.2 (3d Cir. 1991), *abrogated on other grounds by Guidelines Amendments*,

---

[11] As this Court has noted in the past, the standards of review applicable to due process challenges to legislation and to executive acts are different. *Cnty. Concrete Corp. v. Twp. of Roxbury*, 442 F.3d 159, 169 (3d Cir. 2006). When a legislative act is challenged, we determine whether a legitimate government interest is rationally served by the statute. *Id.* (citing *Nicholas v. Pa. State Univ.*, 227 F.3d 133, 139 (3d Cir. 2000)). When non-legislative action is challenged, it violates substantive due process if "'arbitrary, irrational, or tainted by improper motive,' or if 'so egregious that it shocks the conscience.'" *Id.* (quoting *Nicholas*, 227 F.3d at 139).

The Sentencing Guidelines are quasi-legislative, and so for purposes of the due process analysis, we treat them like a statute. *See Mistretta v. United States*, 488 U.S. 361, 393 (1989) (noting "quasi-legislative power of the [Sentencing] Commission"); *United States v. Angel-Guzman*, 506 F.3d 1007, 1013 (10th Cir. 2007) (referring to Sentencing Commission as "quasi-legislative body"); *see also United States v. Jenkins*, 275 F.3d 283, 288 (3d Cir. 2001) (noting in other context that "[w]e interpret United States Sentencing Guidelines the same way we interpret statutes"). This decision is further supported by the decisions of other Courts of Appeals applying the same standard. *See United States v. Bacon*, 646 F.3d 218, 221-22 (5th Cir. 2011) (per curiam) ("A guideline violates due process only if it has no rational basis or is subject to arbitrary application."); *United States v. Meskini*, 319 F.3d 88, 91 (2d Cir. 2003) ("To sustain a federal sentencing statute against a due process . . . challenge, courts need only find that Congress had a rational basis for its choice of penalties." (internal citations and quotation marks omitted)); *United States v. Bredy*, 209 F.3d 1193, 1197 (10th Cir. 2000) ("Due process requires only that a sentencing scheme be rational."); *United States v. Marshall*, 908 F.2d 1312, 1320 (7th Cir. 1990) ("Defendants' sentences bear rational relations to their offenses. That is all the Constitution requires . . . .").

U.S.S.G. App. C at 303-04, amend. 433 (effective Nov. 1, 1991) and at 337-38, amend. 461 (effective Nov. 1, 1992), *as recognized in United States v. Taylor*, 98 F.3d 768, 770-71 (3d Cir. 1996). "Those attacking the rationality of the legislative classification [under a substantive due process challenge] have the burden 'to negative every conceivable basis which might support it.'" *N.J. Retail Merchs. Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 398 (3d Cir. 2012) (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993)) (alterations omitted). Camacho-Rosales has not met his heavy burden.

Contrary to Camacho-Rosales's argument, the Sentencing Guidelines do impose different penalties based on the severity of the prior offense. *See* U.S.S.G. § 4A1.1 (a)-(c) (providing a three point increase for each sentence of imprisonment over thirteen months, a two point increase for each prior sentence of at least sixty days, and a one point increase for each other prior sentence). Even though § 4A1.1(d) increases the criminal history score by two points if "the defendant committed the instant offense while under *any* criminal justice sentence," the gravity-oriented approach embodied in subsections (a), (b), and (c) ensures that all defendants are not subject to the same penalty regardless of the seriousness of their prior offenses. To the extent Camacho-Rosales's constitutional claim hinges on an allegation that individuals with prior convictions for misdemeanors are treated the same as those with prior convictions for felonies, this argument is incorrect. Under the Guidelines, the more serious the prior conviction, the more criminal history points the defendant receives.[12]

---

[12] The Guidelines also took into consideration the gravity of Camacho-Rosales's prior offense in assessing his criminal history points. A misdemeanor conviction for careless

In addition, subsection (d) is not concerned with the gravity of the underlying crime; the offensive conduct is the fact that the defendant, while under "*any* criminal justice sentence" committed "*any* part of the instant offense (i.e., any relevant conduct)." U.S.S.G. § 4A1.1 cmt. n.4 (emphasis added). This subsection is concerned with the defendant's noncompliance with supervisory authority, not the gravity of the crime which caused him to be supervised. *See id.* ("[A] 'criminal justice sentence' means a sentence countable under § 4A1.2 . . . having a custodial or supervisory component, although active supervision is not required for this subsection to apply."). The broad language of the application note, and the nexus to supervision, indicate that disobedience while under supervision is the focus of the subsection. Therefore, Camacho-Rosales's argument is inapposite; since the focus is the defendant's conduct while under supervision, it is irrelevant *why* the defendant was being supervised in the first place. Whether the supervision was imposed for a misdemeanor reckless driving or a felony robbery, the noncompliance with supervisory authority is the same. There is a "conceivable basis" to support this determination: an individual who has in the past demonstrated a lack of respect for criminal justice supervision should be treated more severely than one who has not. *See* U.S.S.G. §4A1.1 introductory cmt. (noting "[a] defendant's record of past criminal conduct is directly relevant" for sentencing purposes).

---

or reckless driving is only "counted" if it is of sufficient gravity—the sentence imposed for the conviction must have been over one year of probation, or at least thirty days' incarceration. U.S.S.G. § 4A1.2(c). Since Camacho-Rosales's conviction for reckless driving resulted in two years' probation, his conduct was sufficiently serious to warrant assessment of a criminal history point.

The Courts of Appeals have routinely determined that sentencing schemes which increase punishment based on past conduct have a rational basis, even if that conduct occurred decades prior. *See, e.g.*, *United States v. Bacon*, 646 F.3d 218, 221-22 (5th Cir. 2011) (per curiam) (goal of deterring recidivism provided rational basis for Guidelines' consideration of conduct occurring thirty years prior); *United States v. Garner*, 490 F.3d 739, 743 (9th Cir. 2007) (stating, while upholding consideration of thirty-five year old conduct, that "[t]he courts have, for some time, recognized that such prior conduct demonstrates an increased danger of recidivism"); *United States v. Wicks*, 132 F.3d 383, 389 (7th Cir. 1997) (upholding application of federal "Three Strikes" statute because "Congress rationally could decide to impose an exceptionally severe sentence on individuals with two prior convictions for serious violent felonies"). Courts of Appeals have also upheld federal sentencing schemes which increase sentences based on past felony convictions, even though some states may classify certain conduct as a felony, while others as a misdemeanor. *See, e.g.*, *United States v. Brandon*, 521 F.3d 1019, 1027 (8th Cir. 2008) (noting application of heavier penalty for those with prior convictions for "felonies," even where same conduct constituted misdemeanor in other jurisdictions, did not violate due process because heavier penalty "served Congress' legitimate purpose of deterring repeat offenders"); *United States v. Tremble*, 933 F.2d 925, 930-31 (11th Cir. 1991) (same).

Given this authority, the Sentencing Commission's determination that a defendant's sentence should be increased if he expressed disobedience to criminal justice supervision, regardless of the reason for that supervision, has a rational basis. Camacho-

16

Rosales has not met his burden of establishing that the assessment of one criminal history point for his prior misdemeanor conviction and of two criminal history points for the commission of the instant offense while on probation for that misdemeanor conviction violates substantive due process.[13]

Since Camacho-Rosales's due process rights were not violated, he is not eligible for the safety-valve created by U.S.S.G. § 5C1.2 and 18 U.S.C. § 3553(f). As a result, there is no possibility Camacho-Rosales could receive a sentence below the statutory minimum of 120 months, which the District Court imposed. Therefore we do not discuss Camacho-Rosales's second claim, pertaining to the minimal/minor participant adjustment in U.S.S.G. § 3B1.2, because it is moot. *See Burkey v. Marberry*, 556 F.3d 142, 149 (3d Cir. 2009) (noting issue is moot if its resolution would require court to "'declare principles or rules of law which cannot affect the matter in issue in the case before it.'" (quoting *Mills v. Green*, 159 U.S. 651, 653 (1895))).

---

[13] Camacho-Rosales also raises, as an afterthought, a due process challenge to the Guideline's determination that certain misdemeanors are "counted" when calculating a criminal history score, while others are excluded. *See* U.S.S.G. § 4A1.2(c)(1) (listing certain offense which are only to be counted when the sentence imposed was over one year of probation or at least thirty days of imprisonment). He seems to be arguing that it violates due process that only certain reckless driving misdemeanors, those resulting in a sufficiently severe penalty, are "counted." However, Camacho-Rosales does not claim that the severity of the prior sentence is an improper consideration when sentencing; in fact, he spends much of his brief arguing that the Sentencing Guidelines improperly preclude consideration of prior offense gravity. Section 4A1.2(c) of the Guidelines only excludes certain misdemeanor reckless driving convictions because they are insufficiently severe, as reflected by the sentence imposed. Camacho-Rosales cites no authority to support his claim that such a consideration violates due process, and thus cannot sustain his burden to demonstrate that the scheme lacks a rational basis.

To the extent Camacho-Rosales argues that the scheme in general, rather than applied to his specific case, is improper, this claim fails. Defendants are not "entitled to assert third parties' rights to better sentencing practices." *Marshall*, 908 F.2d at 1320.

17

### III.  Conclusion

For the foregoing reasons, the convictions and sentences imposed on Duran and Camacho-Rosales by the District Court are affirmed.